TOWN OF SOUTH WINDSOR *v.* SOUTH WINDSOR
POLICE UNION LOCAL 1480, COUNCIL 15,
AFSCME, AFL-CIO
(AC 18222)

O'Connell, C. J., and Landau and Mihalakos, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 26, 1999—officially released May 2, 2000

*Eric R. Brown,* for the appellant (defendant).

*David L. Metzger,* with whom was *Catherine L. Moreton,* for the appellee (plaintiff).

*Opinion*

LANDAU, J. The defendant, South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO

(union), appeals from the judgment of the trial court granting the plaintiff's application to vacate an arbitration award.[2] In its appeal, the union claims that the court improperly (1) substituted its interpretation of the parties' collective bargaining agreement (agreement) for the arbitrators' interpretation with respect to the applicable standard of proof required to prove just cause, the just cause basis for discipline and the grievant's fitness for duty, and (2) concluded that the arbitrators deprived the plaintiff, the town of South Windsor (town), a full and fair hearing by excluding evidence.[3] In the alternative, the union claims that there is no public policy basis on which the trial court's judgment can be affirmed. In its counterstatement of the issues, the town claims that the trial court's judgment can be affirmed on important and clearly defined public policy grounds. We affirm the trial court's judgment on the basis of the town's public policy argument.

The following facts are necessary for our review. For approximately nine years prior to January 8, 1992, John Marchesseault (grievant) was employed by the town as a police officer. On that date, the grievant worked the 3 p.m. to 11 p.m. shift alone in a radio police vehicle. Toward the end of his shift, the grievant was informed of a complaint that several young men had tried to gain access to the Ellsworth School to play basketball at the conclusion of an organized basketball game. Believing that the young men would later try to gain access to the building with a key one of them said he had, the director of the recreation department (director) asked the police to patrol the school to look for unauthorized activity.

---

[2] The court denied the union's motion to confirm the arbitrators' award.

[3] The union also claimed that the court improperly failed to confirm the arbitration award. Because this claim is subsumed in the union's other claims, we need not address it specifically.

The grievant proceeded to the school, observed lights in the hallway and found a broken window at the rear of the gymnasium. He reported his observations to the police dispatcher, who asked a second radio patrol officer to go to the school. The grievant knocked on the door but received no response. When the second officer and the director arrived, the director opened the door and the three entered the building. The grievant saw seven young men playing basketball. He then entered the gymnasium with his weapon drawn and ordered the basketball players to the floor. The grievant asked the second officer to frisk the players for weapons. The grievant's weapon was drawn for approximately one minute, but it was never pointed at anyone.

After asking each of the young men for identification and talking with one of them about the key used to gain access to the school, the second officer decided to charge the young men with simple trespass and to issue each of them a citation, which would result in a mail-in fine of $50. While the officers were writing the citations, the second officer suggested to the grievant that he had overreacted to the situation (hereafter referred to as the basketball incident). The grievant agreed that there was no need for him to have pulled his weapon and acknowledged the danger inherent in having done so. When he returned to the police station, the grievant reported to the sergeant and described what he had done. The grievant's supervisor, however, already had ended his shift.

On his next work day, the grievant spoke to his lieutenant saying, "I fucked up last night." The lieutenant and the grievant had two discussions to determine what might have influenced the grievant's inappropriate behavior. The grievant was unable to come to a conclusion about his conduct.

On or about January 13, 1992, the police chief received a letter of complaint from the mother of one

of the seven young men who had been in the gymnasium playing basketball.[4] The police chief assigned a sergeant to investigate the basketball incident. The grievant temporarily was relieved of duty with pay pending the investigation, which included an evaluation of his fitness for duty. On January 23, 1992, the police chief reviewed the basketball incident with the grievant. Again, the grievant admitted that his behavior was not proper. The investigating sergeant interviewed and took statements from the parties involved, including the grievant, and filed a report. The police chief reviewed the report and discussed the situation with the town manager. They concluded that the grievant should submit to a fitness for duty examination.

On approximately February 24, 1992, the town asked Peter Zeman, a psychiatrist, to determine the grievant's fitness for duty. The town supplied Zeman with all of the information in the grievant's file, including information concerning an incident that occurred in 1983, which also resulted in a fitness for duty evaluation. After he met with the grievant, Zeman asked Leslie Lothstein, a psychologist, to administer psychological tests and render an opinion concerning the grievant's fitness for duty. Both Zeman[5] and Lothstein[6] submitted reports

[4] Three additional complaints were submitted by other participants in the basketball game.

[5] Zeman's report stated in part: "It is my opinion that, at the time of my psychiatric interview, [the grievant] did not show signs of a major psychiatric illness. However, it is my further opinion that he has a significant potential for his mental and emotional functioning to decompensate in stressful situations. During such episodes of decompensation, he is prone to exercise poor judgment and to act in poorly controlled and impulsive manner. Once the stressful situation has passed, his thinking and behavior return rapidly to normal . . . . It is my opinion that [the grievant's] continued potential for unpredictable impulsive behavior and poor judgment prevent him at this time from being 'fit for duty' from a psychiatric perspective."

[6] Lothstein's report stated in part: "Given the nature of his conflicts I do not see him as 'fit for duty' if it means returning to police work with a gun that he may use inappropriately. His psychological test profile suggests that his underlying conflicts (his dependency need and masculine self image) and personality structure (histrionic, dependent and passive) combined with

to the police chief, who shared them with the town manager. The town manager held a hearing on April 15, 1992, to discuss the basketball incident and the results of the fitness evaluation. By letter dated April 28, 1992, the town manager informed the grievant that the town was going to terminate his employment as of May 1, 1992, because during the basketball incident, he had violated §§ 2.3.5 (unnecessary force), 2.3.2 (conduct unbecoming an officer) and 4.7.16 (guidelines and procedures for the use of firearms) of the South Windsor police manual, and because he was unfit for duty in Zeman's and Lothstein's opinions.[7]

The union filed a grievance with the town, claiming that the grievant's termination was without just cause, which the town manager denied. On or about January 25, 1993, the grievant's attorney received a letter from David Johnson, an individual who claimed that he was counseling the grievant.[8] Johnson's letter stated that there was "no reason why [the grievant] should not return to duty as an officer with the ability to carry and handle firearms. I will continue to work with [the grievant] once he returns to active duty." Later, the grievant obtained reports from Ronald Anderson, a psychologist, and Kenneth Selig, a psychiatrist with a law degree, who opined that the grievant was fit for duty.

The dispute was submitted to a three person arbitration panel (arbitrators). The arbitrators were to decide the following issues: (1) Was the grievant terminated by the town for just cause? and (2) If not, what shall the remedy be? The arbitrators held a hearing on numerous days on and between July 15, 1993, and March 4, 1994.

his surfacing aggression and hostility make him a risk for acting inappropriately in high intensity situations."

[7] The grievant was offered a job as a dispatcher, a position that he initially refused but later accepted on July 19, 1992.

[8] The record contains no information as to Johnson's qualifications, a definition of counseling or the basis of Johnson's opinion.

While the hearing was pending, the parties agreed that Ezra Griffith, a professor of psychiatry at Yale University, should evaluate the grievant for fitness for duty. Griffith concluded that the grievant was fit for duty. In February, 1994, Zeman reviewed all of the reports and evaluation materials from the grievant's experts, including Griffith, but did not change his opinion that the grievant was not fit for duty in early 1992.

The arbitrators issued their award on June 11, 1996, sustaining the grievance in part and denying it in part, concluding that the grievant was not terminated for just cause. The arbitrators' award stated that the grievant "shall be reinstated to his position as a South Windsor police officer subject to retraining; a current fitness for duty statement; retraining in firearms; and, counseling as outlined in the analysis and discussion section of the award."

The town filed an application to vacate the award pursuant to General Statutes § 52-418 (a) (3) and (4).[9] The union moved to confirm the award. The trial court denied the motion to confirm and granted the application to vacate, concluding that the arbitrators (1) improperly imposed an excessive standard of proof on the town, (2) failed to allow evidence of the grievant's purported search for mental health assistance, (3) relied on what the arbitrators termed "universally recognized" tests of just cause on which the parties had never agreed and (4) evaluated the grievant's fitness for duty and the

[9] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order vacating the award if it finds any of the following defects . . . (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

town's actions with information that was not available at the time the town terminated the grievant's employment. Additional facts will be addressed as needed.

" 'The scope of review by the court of an arbitrator's power to make an award is limited. Arbitration is a creature of contract between the parties and its autonomy requires a minimum of judicial intrusion. . . . The parties themselves, by the agreement of the submission, define the powers of the arbitrator. . . . The submission constitutes the charter of the entire arbitration proceedings and defines and limits the issues to be decided. . . . When the parties have agreed to a procedure and have delineated the authority of the arbitrator, they must be bound by those limits. . . . An application to vacate or correct an award should be granted where an arbitrator has exceeded his power. In deciding whether an arbitrator has exceeded his power, we need only examine the submission and the award to determine whether the award conforms to the submission.' . . . *Bic Pen Corp.* v. *Local No. 134*, 183 Conn. 579, 583–84, 440 A.2d 774 (1981)." *Hartford* v. *International Assn. of Firefighters, Local 760*, 49 Conn. App. 805, 811–12, 717 A.2d 258, cert. denied, 247 Conn. 920, 722 A.2d 809 (1998).

"In determining whether a submission is unrestricted, we look at the authority of an arbitrator. The authority of an arbitrator to adjudicate the controversy is limited only if the agreement contains express language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review. In the absence of such qualifications, an agreement is unrestricted. . . . Even in the case of an unrestricted submission, we have, however, recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . or (3) the award contravenes one or more of the statutory proscriptions of

§ 52-418." (Citation omitted; internal quotation marks omitted.) Id., 812.

## I

We first address the union's claim that the trial court improperly granted the town's application to vacate.

### A

The first set of issues raised by the union concerns its claim that the trial court substituted its interpretation of the agreement for the arbitrators' interpretation. We agree with the union.

#### 1

The first issue of interpretation concerns the standard of proof that the town was required to meet to prove that the grievant's termination was for just cause. The town claims that it is not the standard of proof the arbitrators used that is at issue, but rather, the fact that the arbitrators did not tell the town until after the hearing that they required the town to prove by more than a preponderance of the evidence that the grievant was terminated for just cause. The town claimed before the trial court that the arbitrators' failure to provide notice of the heightened standard of proof or to permit the town to be heard on the standard of proof deprived the town of a full and fair hearing.

The agreement is silent as to the standard of proof by which the town was required to prove that it terminated the grievant for just cause. Apparently, prior to and during the arbitration, the parties did not discuss or agree on the standard of proof required. In rendering their award, the arbitrators let it be known that they imposed a standard higher than a preponderance of the

evidence.[10] The trial court concluded that in so doing, the arbitrators had improperly added a provision to the agreement. The court reasoned that because article XXX of the agreement states that "[n]o amendment, alteration or variation of the terms of this Agreement shall bind the parties hereto unless made and agreed to in writing by both parties," and because article XVII[11] of the agreement implies that the union has the burden of proof when it questions disciplinary action, the arbitrators exceeded their authority under § 52-418 (a) (3) and prejudiced the town by adding to the agreement a standard of proof provision to which the parties never agreed in writing.

"We have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of § 52-418 of the General Statutes. . . . A challenge of the arbitrator's authority is limited to a comparison of the award to the submis-

---

[10] In their award, the arbitrators stated: "Since the basis for the termination of the grievant, in the first stated instance, resulted from the conclusions of 'fitness for duty' evaluations ordered by the town as a result of the grievant's actions, the panel finds that the town must prove that he is unfit to serve by more than a preponderance of evidence for the termination to be sustained. The discharge not only affects the employee's job, his seniority and other contractual benefits, but also his reputation as to his mental stability.

"The panel finds that such burden must be met by evidence supported by a clinical conclusion, with reasonable medical certainty, that the grievant is not able to continue to work as a gun-carrying police officer, and that he presents a foreseeable risk to his own health and safety and that of the citizenry of South Windsor.

"Along with the 'fitness for duty' basis used for the termination, the town outlines the grievant's violation of certain provisions of the Duty Manual as equally supporting the discharge. These we decided need only be substantiated by a preponderance of the evidence reviewed in light of the just cause elements."

[11] Article XVII, § 17.2, of the agreement provides: "The Union shall have the right to question the propriety of any such disciplinary action or charge, involving suspension, discharge or reduction in grade or rank, through the grievance procedure herein outlined, including arbitration."

sion. . . . An award, therefore, will normally be vacated only if it fails to conform to the submission, and the party challenging it has the burden of producing evidence sufficient to show that it does not conform to the submission. . . . Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that the construction placed upon the facts or the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved." (Citations omitted; internal quotations marks omitted.) *Watertown Police Union Local 541* v. *Watertown*, 210 Conn. 333, 338–39, 555 A.2d 406 (1989).

"Judicial rulings in Connecticut and elsewhere generally have not reviewed the procedural or substantive merits of an arbitrated decision. *General Drivers Local No. 120* v. *Sears, Roebuck & Co.*, 535 F.2d 1072, 1076 (8th Cir. 1976). Here, we are faced with a challenge to the standard of proof utilized by a panel of arbitrators. Because collective bargaining agreements are generally silent on procedural matters such as rules of evidence, an arbitration panel must be vested with the inherent authority to make procedural rulings. Otherwise, the national policy favoring arbitration of collective bargaining grievances would be frustrated." (Internal quotation marks omitted.) *New Haven* v. *AFSCME, Council 15, Local 530*, 9 Conn. App. 396, 399, 519 A.2d 93 (1986), cert. denied, 202 Conn. 806, 520 A.2d 1287 (1987).

Standards of proof generally are a question of law. See *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 799, 700 A.2d 1108 (1997); *State* v. *James*, 237 Conn. 390, 418, 678 A.2d 1338 (1996); *State* v. *Davis*, 229 Conn. 285, 293, 641 A.2d 370 (1994); *In re Juvenile Appeal (83-AB)*, 189 Conn. 58, 60, 454 A.2d 271 (1983); *Issler*

v. *Issler*, 50 Conn. App. 58, 74, 716 A.2d 938 (1998), rev'd on other grounds, 250 Conn. 226, 737 A.2d 383 (1999); *Statewide Grievance Committee* v. *Presnick*, 18 Conn. App. 316, 323, 559 A.2d 220 (1989). Connecticut's appellate courts have not established the standard of proof to be used to determine whether an employer had just cause to terminate a police officer.[12] Courts do not review legal questions involved in an arbitration, save for those set forth in § 52-418 (a). Because the agreement was silent as to the standard of proof by which the town had to prove its termination of the grievant was for just cause, the arbitrators properly established the standard of proof required. Because the agreement did not contain a provision as to the standard of proof required, the town was on notice that the arbitrators could establish the standard of proof and was, therefore, not denied a full and fair hearing. Consequently, the trial court improperly vacated the award on the grounds of lack of notice and the standard of proof the arbitrators applied to the evidence.

2

Next, the union claims that the trial court improperly substituted its interpretation of the agreement for that of the arbitrators with respect to the just cause basis for discipline. The trial court concluded that the arbitrators applied the improper test for determining just cause. Although the town included that claim in its application to vacate, we conclude, on the basis of our review of the record, that the parties did not brief this issue for the trial court.[13] The issue, therefore, was not properly before the trial court, which improperly vacated the award on that ground. See *Commission on Human*

---

[12] By holding in favor of the union on this issue, we in no way imply that we agree or disagree, as a matter of law, with the standard of proof imposed by the arbitrators to the question of whether a police officer was terminated for just cause.

[13] The town also did not brief the issue before this court.

*Rights & Opportunities* v. *Truelove & Maclean, Inc.,*
238 Conn. 337, 344 n.11, 680 A.2d 1261 (1996).

3

The union's third claim is that the trial court improperly interpreted the agreement by concluding that the arbitrators considered expert opinions regarding the grievant's fitness for duty rendered subsequent to April 28, 1992, the date the town terminated the grievant's employment.

The basketball incident occurred on January 8, 1992. Zeman and Lothstein met with the grievant in February and March, 1992. The first contrary opinion was received by the grievant's counsel in late January, 1993. On July 12, 1993, Anderson rendered an opinion that the grievant was fit for duty. Selig conducted interviews with the grievant in June and July, 1993, and rendered an opinion in November of that year, stating that because no one had diagnosed the grievant as suffering from any particular mental illness, the grievant must be fit for duty. Griffith rendered his opinion in late December, 1993.

The arbitrators determined that the town had to prove that the grievant was not fit for duty by more than the preponderance of the evidence and that the standard was to be met "by evidence supported by a clinical conclusion, with reasonable medical certainty, that the grievant is not able to continue to work as a gun-carrying police officer, and that he presents a foreseeable risk to his own health and safety and that of the citizenry of [the town]." The arbitrators noted that a review of the opinions of the parties' evaluators and of Griffith, the psychiatrist on whom the parties agreed, raised "the question as to whether or not the findings provided a conclusion, with reasonable medical certainty, that the grievant would not have been able to return to his position as a police officer if he had been allowed the

opportunity to seek counseling, retraining and appropriate treatment. In other words, was his termination the only reasonable avenue available to the town or was termination based on the evaluation results excessive?" The arbitrators also found that the town did not provide the grievant with an opportunity to overcome the opinions of Zeman and Lothstein before deciding to terminate the grievant.

Before both the trial court and this court, the town argued that the arbitrators chose to believe expert opinions rendered eighteen months after the basketball incident rather than the opinions of experts who examined the grievant within two months of the event. The trial court, too, made much of the tense of the verb to be used by the arbitrators, i.e., *was* the grievant fit for duty or *is* the grievant fit for duty.

"[T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. *Lawrence* v. *Kozlowski*, [171 Conn. 705, 708, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977)]; *O'Donnell* v. *Police Commission*, 174 Conn. 422, 426, 389 A.2d 739 (1978); *Norwich* v. *Norwich Fire Fighters*, 173 Conn. 210, 214, 377 A.2d 290 (1977); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 559, 563, 345 A.2d 520 (1973); *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission*, 161 Conn. 50, 56, 282 A.2d 890 (1971). . . . *Feinson* v. *Conservation Commission*, 180 Conn. 421, 425–26, 429 A.2d 910 (1980); see *Huck* v. *Inland Wetlands & Watercourses Agency*, [203 Conn. 525, 542, 525 A.2d 940 (1987)] (administrative agency is not required to believe any witness [even expert]).

"In short, we may not substitute our own conclusions for those of the commission. Rather, we are limited to determining whether the commission's conclusions of

fact were unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 332, 732 A.2d 144 (1999).

Although it was well within the scope of arbitration for the arbitrators to determine which expert opinions to credit and which to disregard, the arbitrators in the case before us did not say that they chose to believe the opinions of the union's experts rather than the opinions of Zeman and Lothstein. The arbitrators found that on the basis of their review of the evaluations and Griffith's opinion, there was a question as to whether Zeman and Lothstein's opinions were conclusive within a degree of medical certainty. The issue for the arbitrators was not the substance of Zeman and Lothstein's opinions but the quality of their opinions. Because, according to the arbitrators, the town's expert opinions did not meet the standard of proof, the town did not meet its burden of proof. The trial court improperly vacated the award on this ground.

### B

Next, the union claims that the trial court improperly vacated the award by concluding that the town was deprived of a full and fair hearing because the arbitrators excluded evidence of the efforts the grievant made to secure a favorable fitness for duty report prior to November 30, 1993. We agree.

During the hearing, the town asked the grievant on cross-examination whether he had sought other opinions of his fitness for duty between the time that he saw Zeman and the time he saw Selig. The union's counsel objected, and the arbitrators sustained the objection. When asked for a clarification of their ruling, the arbitrators gave two reasons: First, the arbitrators did not believe they had the authority to require the grievant to respond and, second, they had sufficient

medical evidence so that any additional contradictory evidence would be cumulative.

"Hearings before administrative agencies . . . although informal and conducted without regard to the strict rules of evidence, must be conducted so as not to violate the fundamental rules of natural justice. . . . Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." (Citations omitted; internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 203 Conn. 536.

"[A]rbitrators are accorded substantial discretion in determining the admissibility of evidence, particularly in the case of an unrestricted submission, which 'relieve[s] the arbitrators of the obligation to follow strict rules of law and evidence in reaching their decision.' *Norwich Roman Catholic Diocesan Corporation* v. *Southern New England Contracting Co.,* [164 Conn. 472, 477, 325 A.2d 274 (1973)]; *Bridgeport* v. *Bridgeport Police Local 1159,* [183 Conn. 102, 106, 438 A.2d 1171 (1981)]. Indeed, it is within the broad discretion of arbitrators to decide whether additional evidence is required or would merely prolong the proceedings unnecessarily." *O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3,* 203 Conn. 133, 148, 523 A.2d 1271 (1987).

"In light of these well settled principles governing evidentiary issues in arbitration proceedings, we decline to interpret § 52-418 (a) (3) as mandating that every failure or refusal to receive evidence, even relevant evidence, constitutes misconduct. . . . Rather, a party challenging an arbitration award on the ground that the arbitrator refused to receive material evidence

must prove that, by virtue of an evidentiary ruling, he was in fact deprived of a full and fair hearing before the arbitration panel." (Citations omitted.) Id., 149.

"In addition, it must prove that as a result of the improper ruling, it suffered substantial prejudice. *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, [237 Conn. 209, 230–31, 676 A.2d 844 (1996)]. A trial court reviewing an arbitration award, therefore, must consider all of the evidence placed before it concerning the alleged error in order to determine whether the challenging party has proved that the alleged error, *in fact*, denied it a full and fair hearing. Id. In reviewing the trial court's decision, an appellate court must determine whether, on the basis of the record before it, the trial court reasonably could have concluded that the challenging party was, *in fact*, denied such a full and fair hearing." (Emphasis in original.) *Clairol, Inc.* v. *Enertrac Corp.*, 44 Conn. App. 506, 514, 690 A.2d 418, cert. denied, 241 Conn. 906, 695 A.2d 537 (1997).

The arbitrators' award demonstrates that the town was not prejudiced by the arbitrators' decision not to compel the grievant to answer the town's question concerning efforts he had made to obtain a favorable fitness for duty opinion prior to November, 1993. During the course of the hearing, the arbitrators were concerned that they, as laypersons, were faced with opposing expert opinions from the town and the union concerning the grievant's fitness for duty. The arbitrators, therefore, initiated a discussion between the parties that a neutral expert review the grievant's records and the expert opinions submitted to them. Griffith was the person the parties agreed should review the conflicting materials. Because the town agreed to submit the conflicting evidence to Griffith, whose opinion broke the deadlock and formed the basis of the arbitrators' award, we cannot say that the town did not receive a full

and fair hearing because the evidence in question was excluded. The trial court improperly vacated the award on this ground.

## II

The town, in its counterstatement of the issues, claims that the trial court's vacating the arbitrators' award can be affirmed on important and clearly defined public policy grounds. We agree.

The submission to the arbitrators consisted of two parts. If the arbitrators concluded that the grievant was not terminated for just cause, they were asked to determine the remedy. Because they determined that the grievant was not terminated for just cause, the arbitrators ordered his "reinstatement to his position as a police officer subject to retraining required by [General Statutes § 7-294d (b)] and subject to training on the use and possession of firearms. Further, he shall provide to the town a *current fitness for duty statement provided by a medical expert of his choice* and shall continue counseling as determined by said professional surrounding the type of judgment he made on January 8th [1992] which resulted in this arbitration." (Emphasis added.)

The town claims that by giving the grievant the option to choose the medical expert to provide his fitness for duty statement, the arbitrators violated § 52-418 (a) (4) by exceeding their powers in that the town's board of police commissioners is solely responsible for the appointment of police officers. See General Statutes § 7-276. The town argues that the grievant's interest in continued employment as a police officer must be weighed against the town's interest in protecting public safety and public confidence in its police department. The town notes that the grievant himself admitted that his behavior during the basketball incident was inappropriate. It also points out that the arbitrators found that

"the grievant acted in . . . an inappropriate manner based upon the expectations of the town and his own knowledge of what was required during" the basketball incident, and that "[t]he town acted reasonably and within its responsibilities by initiating an investigation of the" basketball incident. The town concludes that by giving the grievant the right to select the fitness evaluator, the arbitrators placed the grievant's employment rights over the rights of the town's citizens to be protected by a police force whose members are psychologically sound and fit for duty.

"[T]he public policy exception to arbitral authority should be narrowly construed and a court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . *Watertown Police Union Local 541* v. *Watertown,* [supra, 210 Conn. 340]. [W]ith respect to matters of public policy generally, arbitrators exceed their authority if their award orders a party to engage in conduct that is patently illegal or in clear violation of public policy. *Stratford* v. *Local 134, IFPTE,* [201 Conn. 577, 585, 519 A.2d 1 (1986)]; *Board of Trustees* v. *Federation of Technical College Teachers,* 179 Conn. 184, 195, 425 A.2d 1247 (1979); [R.] Gorman, Basic Text on Labor Law, Unionization and Collective Bargaining (1976) p. 593. *New Haven* v. *AFSCME, Council 15, Local 530,* 208 Conn. 411, 416–17, 544 A.2d 186 (1988).

"A public policy challenge to an arbitration award is rooted in the principle that the parties cannot expect conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between

them." (Internal quotation marks omitted.) *Hartford* v. *International Assn. of Firefighters, Local 760*, supra, 49 Conn. App. 812–13.

To trigger the public policy exception of § 52-418 (a) (4), the award must violate an explicit public policy or statute. *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 340–41 n.4; see *Board of Trustees* v. *Federation of Technical College Teachers*, supra, 179 Conn. 195; *State* v. *Connecticut Council 4, CEU, AFSCME*, 7 Conn. App. 286, 508 A.2d 806 (1986) (awards set aside pursuant to General Statutes § 54-418 [a] [4] because found in direct conflict with provisions of state statute); *International Brotherhood of Police Officers* v. *Windsor*, 40 Conn. Sup. 145, 483 A.2d 626 (1984) (arbitration award set aside that upheld the disciplining of police officer for refusing to falsify arrest warrant); *Avco Corp.* v. *Preteska*, 22 Conn. Sup. 475, 174 A.2d 684 (1961) (arbitration board held to have exceeded its authority when award rendered found to contravene public policy because it called for reinstatement of employee convicted under state statute for gambling on employer's premises).

"Any town may . . . establish a board of police commissioners . . . ." General Statutes § 7-274. "Such boards shall have all of the powers given by the general statutes to boards of police commissioners, shall have general management and supervision of the police department of such town . . . . Such board shall have the sole power of appointment, promotion and removal of the officers and members of such police department . . . ." General Statutes § 7-276. The police officer standards and training council (council) has authority "[t]o establish uniform minimum educational and training standards for employment as a police officer in full-time positions . . . ." General Statutes § 7-294d (a) (10). "The Police Officer Standards and Training Council requires, as a condition of appointment to a position

of probationary candidate in a law enforcement unit in the State of Connecticut, on or after January 1, 1995, that the candidate has been the subject of a psychological examination during the selection process and that a written report of that examination is on file with the appropriate officials at the law enforcement unit. The Police Officer Standards and Training Council requires that the examination be conducted by a psychologist/ psychiatrist currently licensed by a qualified state board, who provides the law enforcement unit with documentation of the examination and who provides a written opinion of the candidate's overall psychological stability to fill a position as a police officer." Regs., Conn. State Agencies § 7-294e-16 (j).

The union argues that the balance between the town's public safety concerns and the grievant's employment interest is too vague a public policy on which to vacate the arbitrators' award. We disagree, as the legislature made it perfectly clear that the town's board of police commissioners alone is responsible for hiring police officers. The legislature also specifically empowered the council to establish entry level requirements that all police officers must meet. The public policy issue concerning public safety and a police officer's fitness for duty is quite specific.

The union argues that because the applicable regulation, § 7-294e-16 (j), is limited to probationary candidates, it does not apply to the grievant. We will not construe the regulation in a manner that produces an absurd result.[14] Pursuant to § 7-276, the town must nec-

---

[14] "Moreover, principles of statutory construction require the court to construe a statute in a manner that will not frustrate its intended purpose or lead to an absurd result. *Turner* v. *Turner,* 219 Conn. 703, 712, 595 A.2d 297 (1991). The court must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Internal quotation marks omitted.) *New Milford Savings Bank* v. *Jajer,* 52 Conn. App. 69, 79, 726 A.2d 604 (1999).

essarily be concerned with every police officer's fitness for duty, whether a probationary or established officer. Because the arbitrators' award violates the specific public policy of a town's control over the fitness for duty of its police force, we affirm the trial court's judgment sustaining the town's appeal.[15]

The judgment is affirmed.

In this opinion the other judges concurred.

[15] Practice Book § 63-4 (a) (1) (A) provides that the appellee may "present for review alternate grounds upon which the judgment may be affirmed . . . ."