## TOWN OF SOUTH WINDSOR v. SOUTH WINDSOR POLICE UNION LOCAL 1480, COUNCIL 15, AFSCME, AFL-CIO
(SC 16338)

Borden, Norcott, Katz, Sullivan and Vertefeuille, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 16—officially released May 1, 2001

*Eric R. Brown,* for the appellant (defendant).

*David L. Metzger*, with whom were *P. Jo Anne Burgh*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. Within the past year, this court has had three occasions to elaborate on and apply the "public policy exception to the general rule of deference to an arbitrator's award made pursuant to an unrestricted submission [to arbitration]." *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 43, 757 A.2d 501 (2000); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 474–75, 747 A.2d 480 (2000); *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 427–28, 747 A.2d 1017 (2000). This certified appeal presents us with a fourth such occasion.

Following our grant of certification to appeal, the defendant, the South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO, appeals from the judgment of the Appellate Court in favor of the plaintiff, the town of South Windsor. The Appellate Court affirmed the judgment of the trial court vacating an arbitration award ordering the reinstatement of the grievant, a South Windsor police officer, who had been terminated based on unfitness for duty. *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 57 Conn. App. 490, 492, 750 A.2d 465 (2000). In the Appellate Court's view, the award violated "the specific public policy of a town's control over the fitness for duty of its police force . . . ." Id., 511. We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the arbitrators' award should be vacated on the ground of an important and clearly defined public policy?" *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 253 Conn. 924, 754 A.2d 800 (2000). We conclude that the award did not violate an important

and clearly defined public policy and, accordingly, we reverse the judgment of the Appellate Court.

On April 28, 1992, the plaintiff terminated the employment of the grievant, John Marchesseault, as a police officer. The defendant filed a grievance that ultimately was submitted to arbitration. The arbitrators issued an award sustaining the grievance in part and denying it in part,[1] and ordering Marchesseault reinstated on certain conditions. The plaintiff moved to vacate the award, and the defendant moved to confirm the award. The trial court rendered judgment granting the motion to vacate the award and denying the motion to confirm. The defendant appealed from the trial court's judgment to the Appellate Court, which affirmed the judgment. *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 57 Conn. App. 511. This certified appeal followed.

The facts, as found by the arbitrators in their award dated June 11, 1996, are not in dispute. The case arose out of an incident that occurred on January 8, 1992. Marchesseault was a nine year veteran of the plaintiff's police department. Toward the end of the 3 p.m. to 11 p.m. shift, he was working alone in a radio car when he responded to a complaint by the recreation department of the town that several young men might be gaining entrance to the Ellsworth School to play basketball in the gymnasium. A supervisor of the recreation department had asked that a police car go to the building to check whether there were persons therein without permission.

As Marchesseault pulled up to the building, he saw lights on in the hallway. He radioed this information to police headquarters, along with his opinion that lights seemed to be about to come on in the gymnasium, and

[1] The denial portion of the award involved Marchesseault's claims for back pay and attorney's fees. Those issues are not before us in the present appeal.

that he had found a window kicked in or broken at the rear of the gymnasium. The police dispatcher ordered a second radio car to proceed to the building as backup. As Marchesseault and the backup officer, James Nicoletta, were surveying the situation, the director of the recreation department arrived and unlocked the door to the building. Marchesseault entered first, followed by Nicoletta and the director.

Through the window of the gymnasium doors, they saw seven young men playing basketball. Marchesseault told Nicoletta that he intended to order them to the ground. He then drew his firearm, entered the gymnasium and yelled to the young men to get down on the floor. He advanced into the gymnasium, and asked Nicoletta to pat them down for weapons. Marchesseault kept his weapon drawn for approximately one minute. Nicoletta, after checking the young men's identifications, decided to issue them citations for simple trespass, which would result in a mail-in fine of $50. Nicoletta suggested to Marchesseault that he had overreacted, and Marchesseault agreed that there had been no need for him to draw his weapon, and that it had been dangerous to do so.

On his return to the department, Marchesseault told the sergeant what he had done. It was the end of the shift, and the shift supervisor had gone home. The next day, Marchesseault spoke to Lieutenant Roland J. Godin, and told him, "I fucked up last night." Godin and Marchesseault then had two discussions in which they unsuccessfully attempted to determine what might have influenced Marchesseault's conduct.

On or about January 13, 1992, the chief of police, Gary K. Tyler, received a letter of complaint from the mother of one of the young men involved in the incident. Tyler instituted an investigation, during which additional complaints were filed by three of the young men

involved in the incident. Upon the conclusion of the investigation, Tyler discussed the situation with the town manager, and they concluded that Marchesseault would submit to an examination for fitness for duty. Tyler then reviewed the incident with Marchesseault, who repeated his admission that his conduct had not been proper. Tyler temporarily relieved Marchesseault of duty with pay, pending an evaluation of his fitness for duty.

In early February, 1992, Marchesseault was referred to Peter Zeman, a psychiatrist at the Institute of Living, for an evaluation of his fitness for duty. The plaintiff supplied Zeman with all of the information in Marchesseault's file that had been gathered as part of the investigation.[2] After their initial meeting, Zeman requested that Marchesseault also be referred to Leslie Lothstein, the director of psychology at the Institute of Living, for psychological testing and an additional opinion regarding his fitness for duty. After meeting with Marchesseault again and reviewing Lothstein's report, in which Lothstein opined that Marchesseault was not fit for duty,[3] Zeman reported to Tyler that it was his opinion

[2] This information also included information regarding an incident in 1983 with a firearm that also had resulted in a fitness for duty evaluation. That evaluation, however, indicated no major psychological disturbances or pathology, and the evaluator, Robert Meier, a psychologist, stated that "because Officer Marchesscault has many positive characteristics, including a high level of ability and overall good judgment . . . he is able to perform effectively as a police officer." The then chief of police sent Marchesseault a letter indicating that his probationary period would end and that he "felt that [Marchesseault] posed no basic threat to [him]self, the Department, or any of its members."

[3] The arbitrators' award quoted the following passage from Lothstein's report: "Given the nature of his conflicts I do not see him [as] 'fit for duty' if that means returning to police work with a gun that he may use inappropriately. His psychological test profile suggests that his underlying conflicts (his dependency needs and masculine self image) and personality structure (histrionic, dependent, and passive) combined with his surfacing aggression and hostility make him a risk for acting inappropriately in high intensity situations."

that Marchesseault was not " 'fit for duty' from a psychiatric perspective."[4] Both Lothstein's and Zeman's reports were sent to Tyler on March 30, 1992.

On April 9, 1992, the town manager scheduled a hearing for April 15, 1992, to discuss the results of the evaluation reports and the January 8 incident. On April 20, 1992, the town manager met with Marchesseault and his attorney. They requested an opportunity to seek additional review of his fitness for duty, but the town manager denied that request. On April 28, 1992, the town manager terminated Marchesseault from employment effective May 1, 1992,[5] ruling that he was unfit for duty based on Zeman's and Lothstein's reports.

Article XVI of the collective bargaining agreement between the parties provided in relevant part that "[a] grievance . . . shall be considered to be employee or Union complaints concerned with: A. Discharge, suspension, or other disciplinary action. . . . D. Interpretation and application of rules and regulations and policies of the Police Department . . . ." The agreement also provided a grievance procedure of four steps, the last of which was "final and binding" arbitration before the state board of mediation and arbitration. Section 17.2 of article XVII, Discipline and Discharge, provided: "The Union shall have the right to question

---

[4] The arbitrators' award quoted the following passage from Zeman's report: "It is my opinion that, at the time of my psychiatric interviews, Officer Marchesseault did not show signs of a major psychiatric illness. However, it is my further opinion that he has a significant potential for his mental and emotional functioning to decompensate in stressful situations. During such episodes of decompensation, he is prone to exercise poor judgment and to act in [a] poorly controlled and impulsive manner. Once the stressful situation has passed, his thinking and behavior return rapidly to normal. . . . It is my opinion that Officer Marchesseault's continued potential for unpredictable impulsive behavior and poor judgment prevent him at this time from being 'fit for duty' from a psychiatric perspective."

[5] Subsequently, Marchesseault was offered and ultimately accepted alternate employment as a dispatcher, effective July 19, 1992.

the propriety of any such disciplinary action or charge, involving suspension, discharge or reduction in grade or rank, through the grievance procedure herein outlined, including arbitration." Marchesseault filed a grievance with the town manager on May 6, 1992, which she denied on May 19, 1992.[6]

After exhausting the grievance procedures, the parties instituted this proceeding before a panel of three arbitrators of the state board of mediation and arbitration. Because the parties were unable to agree on a submission,[7] the arbitrators framed the following submission: "1. Was the Grievant, Officer John Marchesseault, terminated by the Town of South Windsor for just cause? 2. If not, what shall the remedy be?" The hearings began on July 15, 1993, and continued through March 4, 1994.

---

[6] The town manager also terminated Marchesseault for violations of §§ 2.3.5, 2.3.2 and 4.7.16 of the police department's rules and regulations. Section 2.3.5 prohibits "using more physical force than necessary to accomplish a proper police purpose." Section 2.3.2 provides that "officers shall conduct themselves at all times, both on or off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department or that which impairs the operation or efficiency of the Department or officer." Section 4.7.16 provides: "As a general rule, an officer should use only the minimum amount of force which is necessary for the accomplishment of his duties. He should exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms. . . . [D] 1. As a general rule, officers shall not remove a firearm from the holster or display weapons unless there is sufficient justification."

The arbitrators ruled that, although Marchesseault's violations of these rules and regulations provided just cause for severe discipline, "and that some retraining and directed counseling were and are in order," they did not justify termination. That aspect of the arbitrators' decision is not before us in the present appeal.

[7] The plaintiff presented the following submission: "Was there just cause for the dismissal of the Grievant? If not, what shall the remedy be?" The defendant presented the following submission: "Whether or not the Officer John Marchesseault's termination was proper and for just cause? If not, what shall the remedy be?"

On July 12, 1993, Marchesseault had obtained a written opinion from Ronald Anderson, a psychologist, that he was "fit for duty."[8] On November 30, 1993, while the hearings were in progress, Kenneth Selig, a psychiatrist who had interviewed Marchesseault in June and July, 1993, issued a written report stating that, in his opinion, because no one had diagnosed Marchesseault as suffering from any particular mental illness, he was fit for duty.[9]

Faced with conflicting expert opinions regarding Marchesseault's fitness for duty, the arbitrators initiated discussions between the parties regarding the appointment of an independent expert. As a result, the parties agreed that Ezra Griffith, a professor of psychiatry at Yale University, would evaluate Marchesseault for fitness for duty. Griffith's evaluation was based on: an examination of Marchesseault; interviews with various individuals who had specific knowledge of Marchesseault; an interview with Zeman; a comprehensive review of certain transcripts of the arbitration proceedings; various police reports of the January 8 incident; statements of civilian witnesses; the pertinent provisions of the police duty manual; the evaluations of the other five mental health professionals; the reports

[8] In October, 1992, Marchesseault had begun counseling with a person named David Johnson. In January, 1993, Johnson wrote to Marchesseault's attorney, stating his opinion that "there was no reason why [Marchesseault] should not return to duty as an officer with the ability to carry and handle firearms." There is nothing in the record, however, regarding Johnson's qualifications, the nature of the counseling he provided, or the basis of his opinion.

[9] Selig stated that Marchesseault had "a clean psychiatric bill of health," and concluded that Lothstein's evaluation, which was the most critical of the six mental health professionals who ultimately examined Marchesseault, was "highly inconsistent with the other evaluations and inconsistent with Officer Marchesseault's history. More detailed analysis of [Lothstein's] evaluation by [Anderson] renders it essentially incorrect. I agree with [Anderson] that [Lothstein's] evaluation should be removed from Officer Marchesseault's file."

regarding a 1983 incident involving the use of a firearm; see footnote 2 of this opinion; and the attendant fitness for duty evaluation. Griffith subsequently found Marchesseault fit for duty. Thereafter, in February, 1994, Zeman reviewed all of the reports and evaluations, including that of Griffith, but did not change his opinion that Marchesseault was unfit for duty in early 1992.

The arbitrators first addressed the burden of proof: "Since the basis for the termination of [Marchesseault], in the first stated instance, resulted from the conclusions of 'fitness for duty' evaluations ordered by the [plaintiff] as a result of [his] actions, the Panel finds that the [plaintiff] must prove that he is unfit to serve by more than a preponderance of [the] evidence for the termination to be sustained. The discharge not only affects the employee's job, his seniority and other contractual benefits, but also his reputation as to his mental stability. The Panel finds that such burden must be met by evidence supported by a clinical conclusion, with reasonable medical certainty, that [Marchesseault] is not able to continue to work as a gun carrying police officer and that he presents a foreseeable risk to his own health and safety and that of the citizenry of South Windsor."

Then, turning to the first question posed by the submission, the arbitrators found that Marchesseault had not been terminated for just cause. In this respect, they determined that his termination was not the only reasonable discipline available to the plaintiff, and that, based on the evaluation results, termination had been excessive. They specifically found that Marchesseault "acted in such an inappropriate manner based upon the expectations of the [plaintiff] and his own knowledge of what was required during that incident, he should have been severely disciplined for his actions, and that some retraining and directed counseling were and are in order." Although they specifically did not find that

the plaintiff had acted unreasonably in relying on the opinions of its own medical experts, they agreed with Selig that Marchesseault had a " 'clean psychiatric bill of health,' " and with Anderson that Lothstein's evaluation should have been removed from his personnel file. Noting Zeman's findings that, although Marchesseault was not mentally ill, " 'he has significant potential to decompensate in stressful situations,' " the arbitrators specifically agreed with Griffith's conclusions that Marchesseault's personnel record contained no history of such decompensation, there was no documentation of it in his job performance reviews over his more than nine years with the police department, and that " 'whatever "decompensation" there was, it was very swift and not clinically remarkable.' "

The arbitrators specifically addressed Zeman's conclusion that, at the time of his examination of Marchesseault in 1992, Marchesseault's continued potential for unpredictable impulsive behavior and poor judgment prevented him at that time from being fit for duty. The arbitrators found that this conclusion in Zeman's report, in light of Marchesseault's record with the department and the finding of no mental illness, "should have required that the [plaintiff] provide [Marchesseault] an opportunity to address his 'decompensation' with counseling, etc. at that time through the use of a leave of absence or some other reasonable accommodation, subject to another evaluation at the end of that period." The arbitrators also found that the plaintiff may have affected the outcome of the evaluations by providing Zeman with information regarding the 1983 incident, for which Marchesseault had not been disciplined or found psychologically impaired in any way, and that Zeman had given that information weight in his determination.

The arbitrators specifically found Griffith's evaluation "persuasive." It is fair to say that they accepted

Griffith's evaluation and rejected those of Zeman and Selig to the contrary. They also addressed Zeman's concern as to why Marchesseault had not explained clearly his poor judgment at the time of the incident, and Zeman's opinion that this showed a lack of introspection on his part. In this regard, the arbitrators noted Griffith's explanation that Marchesseault had talked to him with insight about his fatigue that evening, his wish to get home to his wife, and his irritation with the young men playing in the gym. The arbitrators also specifically noted that the record supported another of Griffith's conclusions, namely, that Marchesseault's " 'behavior did suggest a lack of appreciation for the sociocultural context in which he was operating—which is that a lack of respect for the people in South Windsor will not be tolerated by his superiors.' "

Having found that the termination was without just cause because it was excessive, the arbitrators turned to the second question, namely, the remedy. The arbitrators noted that they were "faced with an unusually difficult situation in fashioning an appropriate remedy since the [plaintiff] chose to terminate [Marchesseault] without the benefit of some leave of absence to deal with his alleged mental disorders; time for retraining; or, imposing a suspension as discipline for the violations of the Duty Manual," particularly in view of the plaintiff's denial of his request for the opportunity to seek evaluations, in addition to those of the plaintiff's experts, regarding his fitness for duty. The arbitrators noted that "a more reasonable response to the evaluations would have been to allow for a second evaluation to be performed. If that evaluation was in conflict with the evaluation[s] performed for the [plaintiff]—a third party should have been requested to perform an evaluation, as was the case once the matter reached arbitration." Thus, the arbitrators reasoned, Marchesseault, "after over nine years of service to the [plaintiff], was entitled

to a more reasonable approach to the incident including a discussion surrounding a leave of absence (for mental health reasons—based on the [plaintiff's] experts) and for time for retraining in all aspects of the possession and use of firearms."

Faced, therefore, with devising an appropriate remedy for the excessive termination, the arbitrators ordered as follows: Marchesseault's "reinstatement to his position as a police officer subject to retraining required by [General Statutes § 7-294d],[10] and subject to training on the use and possession of firearms. Further, he shall provide to the [plaintiff] a current fitness for duty statement provided by a medical expert of his choice and shall continue counseling as determined by said professional surrounding the type of judgment he made on January 8th which resulted in this arbitration."[11]

[10] General Statutes § 7-294d (b) provides: "No person may be employed as a police officer by any law enforcement unit for a period exceeding one year unless he has been certified under the provisions of subsection (a) of this section or has been granted an extension by the council. No person may serve as a police officer during any period when his certification has been cancelled or revoked pursuant to the provisions of subsection (c) of this section. In addition to the requirements of this subsection, the council may establish other qualifications for the employment of police officers and require evidence of fulfillment of these qualifications. The certification of any police officer who is not employed by a law enforcement unit for a period of time in excess of two years, unless such officer is on leave of absence, shall be considered lapsed. Upon reemployment as a police officer, such officer shall apply for recertification in a manner provided by the council. The council shall certify any applicant who presents evidence of satisfactory completion of a program or course of instruction in another state equivalent in content and quality to that required in this state, provided he passes an examination or evaluation as required by the council."

[11] The formal arbitration award provided: "The grievance is sustained in part and denied in part. The Grievant, Officer Marchesseault, was not terminated for just cause. He shall be reinstated to his position as a South Windsor police officer subject to retraining; a current fitness for duty statement; retraining in firearms; and, counseling as outlined in the Analysis and Discussion section of the Award." Neither party claims any substantive difference between this language and the language quoted in the text of this opinion.

The parties filed cross motions to confirm and to vacate the award. The trial court granted the plaintiff's motion to vacate the award on various grounds, denied the defendant's motion to confirm, and rendered judgment accordingly. The defendant appealed from the trial court's judgment to the Appellate Court. In that court, the defendant claimed that the trial court improperly had substituted its judgment for that of the arbitrators regarding: (1) the applicable burdens of proof before the arbitrators; (2) the appropriate test for just cause; (3) consideration of expert opinions rendered subsequent to the date of Marchesseault's termination; and (4) the exclusion of evidence regarding efforts by Marchesseault to secure a favorable fitness report. *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 57 Conn. App. 498–507. The plaintiff presented an alternate ground for affirming the judgment, namely, that the award had violated an important and clearly defined public policy. Id., 507. The Appellate Court agreed with the defendant's four challenges to the trial court's judgment, but also agreed with the plaintiff's alternate ground for affirmance. The court held that there was a clear, important and specific public policy, drawn from General Statutes §§ 7-274,[12]

[12] General Statutes § 7-274 provides: "Establishment of town police commissions. Any town may, by ordinance, establish a board of police commissioners to be elected, in accordance with the provisions of section 9-201 or to be appointed by the council or board of directors of a town, the common council or other body empowered to make ordinances of a city, the board of burgesses of a borough or the board of selectmen of a town not having a council or board of directors, provided in a town having both a board of selectmen and a representative town meeting such ordinance may designate the representative town meeting as the appointing authority, for the purpose of organizing and maintaining a police department in such town. Such board shall consist of three, five or seven electors, all of whom shall be resident taxpayers of such town. Such commissioners shall be sworn to the faithful performance of their duties and shall serve without compensation, but their actual expenses and disbursements incurred in the performance of their duties shall be paid from the town treasury."

7-276[13] and 7-294d (a) (10),[14] as well as § 7-294e-16 (j) of the Regulations of Connecticut State Agencies,[15] that a municipality alone is responsible for determining a police officer's fitness for duty, and that the "award violate[d] the specific public policy of a town's control over the fitness for duty of its police force . . . ." Id., 510–11. Accordingly, the Appellate Court affirmed the trial court's judgment vacating the award. Id., 511.

The defendant claims that the Appellate Court improperly concluded that the arbitrators' award vio-

[13] General Statutes § 7-276 provides: "Powers of commissioners. Such boards shall have all of the powers given by the general statutes to boards of police commissioners, shall have general management and supervision of the police department of such town and of the property and equipment used in connection therewith, shall make all needful regulations for the government thereof not contrary to law and may prescribe suitable penalties for the violation of any such regulation, including suspension or removal from office of any officer or member of such police department. Such board shall have the sole power of appointment, promotion and removal of the officers and members of such police department, under such regulations as it adopts for the purpose, and such appointees shall hold office during good behavior and until removed for cause upon written charges and after hearing. The members of such police department shall have all such authority with respect to the service of criminal process and the enforcement of the criminal laws as is vested by the general statutes in police officers and constables."

[14] General Statutes § 7-294d (a) provides in relevant part: "The Police Officer Standards and Training Council shall have the following powers . . . (10) To establish uniform minimum educational and training standards for employment as a police officer in full-time positions, temporary or probationary positions and part-time or voluntary positions . . . ."

[15] Section 7-294e-16 (j) of the Regulations of Connecticut State Agencies provides: "Psychological Examination. The Police Officer Standards and Training Council requires, as a condition of appointment to a position of probationary candidate in a law enforcement unit in the State of Connecticut, on or after January 1, 1995, that the candidate has been the subject of a psychological examination during the selection process and that a written report of that examination is on file with the appropriate officials at the law enforcement unit. The Police Officer Standards and Training Council requires that the examination be conducted by a psychologist/psychiatrist currently licensed by a qualified state board, who provides the law enforcement unit with documentation of the examination and who provides a written opinion of the candidate's overall psychological stability to fill a position as a police officer."

lated an explicit, well-defined and dominant public policy of the state. We agree.

It is undisputed that the submission to arbitration was voluntary and unrestricted. The question is, therefore, whether the award falls within "the public policy exception to the general rule of deference to an arbitrator's award made pursuant to an unrestricted submission." *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 43. "The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. *Garrity* v. *McCaskey*, [223 Conn. 1, 7, 612 A.2d 742 (1992)]. A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. *Stamford* v. *Stamford Police Assn.*, [14 Conn. App. 257, 259, 540 A.2d 400 (1988)]; *Board of Trustees* v. *Federation of Technical College Teachers*, [179 Conn. 184, 195, 425 A.2d 1247 (1979)]. When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. *Board of Trustees* v. *Federation of Technical College Teachers*, supra [195]. Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. [*United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 43, 108 S. Ct. 364, 98 L. Ed. 2d 286

(1987)]; see *W. R. Grace & Co.* v. *Rubber Workers*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983) . . . . *New Haven* v. *AFSCME, Council 15, Local 530*, [208 Conn. 411, 417, 544 A.2d 186 (1988)]. The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. Id. Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate. . . . *Watertown Police Union Local 541* v. *Watertown*, 210 Conn. 333, 339–40, 555 A.2d 406 (1989)." (Internal quotation marks omitted.) *Groton* v. *United Steelworkers of America*, supra, 45–46. It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule. We conclude that the award in the present case does not meet these demanding requirements.

It is necessary to understand, first, the precise public policy identified by the Appellate Court as having been violated by the award. The court identified that policy as "the specific public policy of a town's control over the fitness for duty of its police force . . . ." *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 57 Conn. App. 511. Although the Appellate Court did not fully explicate the contours of that public policy, we view it in its likely narrowest formulation, namely, that, at least where the town has made a good faith determination of a police officer's lack of fitness for duty, based on a reasonable investigation and sufficient evidence, that determination controls, despite any contrary determination arrived at pursuant to the arbitration procedures of a collective bargaining agreement. Under this view, the scope of any unrestricted arbitration proceeding chal-

lenging a termination of an officer by a town for lack of fitness for duty, in effect, would be limited to assessing whether the termination had been based on sufficient evidence, and had been in good faith after a reasonable investigation.[16]

Neither the statutes nor the regulation on which the Appellate Court relied, however, support the view that, even as narrowly formulated, there is such an explicit, well-defined and dominant public policy that governs this case. Section 7-274 provides, in general terms, that a town may, by ordinance, establish a board of police commissioners "for the purpose of organizing and maintaining a police department in such town. . . ." See footnote 12 of this opinion. Section 7-276 provides that such a board of police commissioners "shall make all needful regulations for the government thereof . . . and may prescribe suitable penalties for the violation of any such regulation, including suspension or removal from office of any officer or member of such police department. Such board shall have the sole power of appointment, promotion and removal of the officers and members of such police department, under such regulations as it adopts for the purpose, and such appointees shall hold office during good behavior and until removed for cause upon written charges and after hearing. . . ." See footnote 13 of this opinion. Whatever effect, if any, on a termination for lack of fitness for duty that these two statutes might have where a town

---

[16] There is, of course, an even broader reading of the Appellate Court's view of the public policy at stake—that the town's determination of fitness for duty controls absolutely, irrespective of the nature of the evidence or the investigation. This view would mean, in effect, that the entire subject of termination for fitness for duty is not even arbitrable because the outcome of any such proceeding would be a foregone conclusion. We note that at no time during this case did the plaintiff claim that the question of Marchesseault's termination was not arbitrable. Furthermore, our conclusion that the narrow view is not sustainable in the present case necessarily encompasses the broader view as well.

with such a board has entered into a collective bargaining agreement that, as in the present case, commits the question of termination to the grievance procedure, these two statutes have no bearing on the present case, because the plaintiff undisputedly does not have a board of police commissioners.

The other statute and its corresponding regulation relied on by the Appellate Court are § 7-294d (a) (10); see footnote 14 of this opinion; and § 7-294e-16 (j) of the regulations; see footnote 15 of this opinion. Section 7-294d (a) (10) provides that the police officer standards and training council, established pursuant to General Statutes § 7-294b,[17] has the power "[t]o estab-

---

[17] General Statutes § 7-294b provides: "Members of council. Holding of other office. (a) There shall be a Police Officer Standards and Training Council which shall be within the Division of State Police of the Department of Public Safety for administrative purposes only and which shall consist of the following members appointed by the Governor: (1) A chief administrative officer of a town or city in Connecticut; (2) the chief elected official or chief executive officer of a town or city in Connecticut with a population under twelve thousand which does not have an organized police department; (3) a member of the faculty of The University of Connecticut; (4) eight members of the Connecticut Police Chiefs Association who are holding office or employed as chief of police or the highest ranking professional police officer of an organized police department of a municipality within the state; (5) the Chief State's Attorney; (6) a member of the Connecticut Coalition of Police and Corrections Officers; and (7) five public members. The Commissioner of Public Safety and the Federal Bureau of Investigation special agent-in-charge in Connecticut or their designees shall be voting ex-officio members of the council. Any nonpublic member of the council shall immediately upon the termination of his holding the office or employment which qualified him for appointment cease to be a member of the council. A member appointed to fill a vacancy shall be appointed for the unexpired term of the member whom he is to succeed in the same manner as the original appointment. The Governor shall appoint a chairperson and the council shall appoint a vice-chairperson and a secretary from among the members. The members of the council shall serve without compensation but shall be entitled to actual expenses involved in the performance of their duties.

"(b) Membership on the council shall not constitute holding a public office. No member of the council shall be disqualified from holding any public office or employment by reason of his appointment to or membership on the council nor shall any member forfeit any such office or employment

lish uniform minimum educational and training standards for employment as a police officer in full-time positions, temporary or probationary positions and part-time or voluntary positions . . . ." The purportedly applicable training standard established by the council, embodied in regulation § 7-294e-16 (j), provides in relevant part that the council "requires, as a condition of appointment to a position of probationary candidate in a law enforcement unit in the State of Connecticut, on or after January 1, 1995, that the candidate has been the subject of a psychological examination during the selection process and that a written report of that examination is on file with the appropriate officials at the law enforcement unit." This statutory and regulatory scheme does not establish an explicit, well established and dominant public policy that, irrespective of or in limitation of a collective bargaining agreement, a town has control over termination for fitness for duty of a police officer such as Marchesseault. Section 7-294e-16 of the regulations is entitled "Entry-level requirements." Subsection (j) of § 7-294e-16 concerns, not termination of employed police officers, but "condition[s] of appointment to a position of probationary candidate . . . ." Marchesseault was not a probationary candidate, nor was he appointed to the plaintiff's police force after January 1, 1995.

Furthermore, our precedents in the realm of discharge of municipal policemen undermine the public policy exception asserted in the present case. In *Board of Police Commissioners* v. *White*, 171 Conn. 553, 555–56, 370 A.2d 1070 (1976), and *Board of Police Commissioners* v. *Maher*, 171 Conn. 613, 619–20, 370 A.2d 1076 (1976), New Haven policemen had been discharged for various acts of misconduct, including procuring false statements in connection with a police department

by reason of his appointment to the council, notwithstanding the provisions of any general statute, special act or local law, ordinance or charter."

investigation and falsifying arrest reports in order to strengthen the case against the arrestee. In rejecting the municipality's challenges to the authority of the state board of mediation and arbitration to arbitrate the propriety of the discharges, we held that the collective bargaining agreement properly provided that termination of a police officer is a grievance that may be made the subject of the grievance procedure in the contract, including binding arbitration as the ultimate step. *Board of Police Commissioners* v. *White*, supra, 564; *Board of Police Commissioners* v. *Maher*, supra, 621. We stated, moreover, that there was no conflict between the city's charter provision, which gave its police commissioners the power to remove a police officer for cause, and the contract, which made the removal of such a police officer a subject for the grievance procedure in the contract, including arbitration. *Board of Police Commissioners* v. *White*, supra, 563–64. Although certainly not dispositive of the question before us, these cases, which hold that termination of a police officer for serious and official misconduct is an appropriate matter for grievance under a collective bargaining agreement, do not suggest that an implied exception exists when the misconduct is deemed to constitute lack of fitness for duty.

In sum, the collective bargaining agreement in the present case clearly committed the question of termination of a police officer to the grievance procedure, including arbitration. That included a termination for alleged lack of fitness for duty. We see no explicit, well-defined and dominant public policy that prohibited the arbitrators, in concluding that the termination had not been for just cause, from concluding that Marchesseault was fit for duty, and therefore disagreeing with the contrary determination of the municipal authorities.

The plaintiff submits four alternative public policies that, it contends, are explicit, well-defined and domi-

nant, and that the arbitration award violates: (1) the protection of the public from police officers who lack the psychological stability to handle weapons safely; (2) the award providing for reinstatement should have given the plaintiff the opportunity to assess Marchesseault's current fitness for duty; (3) the public policy fostering the confidence of the public in its police force with respect to matters of public safety; and (4) the imposition by the arbitrators of a burden of proof higher than the preponderance of the evidence, without giving the plaintiff advance notice thereof, violated due process. We are not persuaded by any of these contentions.

The first contention proceeds from the premise that Marchesseault lacked the requisite psychological stability to handle weapons safely. That premise simply ignores the fact that, after a full hearing, and after the submission of competing expert witness evidence, the arbitrators found to the contrary. The arbitrators specifically weighed Marchesseault's conduct, history and experience, as well as the opinions of the various experts who had evaluated him, found the opinions and evaluations of Zeman and Lothstein wanting, and found Griffith's evaluation persuasive. We also note in this connection that the arbitrators, in fashioning the remedy for the unjustified termination, made the reinstatement "subject to training on the use and possession of firearms," required Marchesseault to submit a current fitness for duty statement by a medical expert of his choice, and ordered that he "continue counseling as determined by said professional" regarding his misjudgment in the incident in question. Thus, the arbitrators, in fashioning the remedy, accounted for any potential lingering questions regarding Marchesseault's suitability to use and possess firearms.

The second contention is based on the fact that, in their award, the arbitrators required Marchesseault, as a condition of his reinstatement, to provide the plaintiff

with "a current fitness for duty statement provided by a medical expert *of his choice . . . ."* (Emphasis added.) The plaintiff argues that: (a) this excludes any role of the plaintiff in having Marchesseault evaluated by an expert of its choice; (b) "[t]he public policy of the state is that some public body—a police commission or town government—be responsible for the selection, direction and dismissal of police officers," for which the plaintiff cites § 7-276; and (c) this denies, therefore, the plaintiff "the ability to satisfy its obligation to be certain that [Marchesseault] is in fact psychologically stable and fit for duty." The plaintiff's position is flawed for several reasons.

The plaintiff ignores the procedural history on which the arbitrators relied in fashioning this part of their remedy. They had noted that the plaintiff had, at the time of the termination, refused Marchesseault the opportunity to seek, and therefore present, evaluations other than those by Zeman and Lothstein, on which the plaintiff had relied. Moreover, by the time of their award in 1996, four years after the incident, the arbitrators already had found Griffith's positive evaluation of Marchesseault persuasive, and Zeman's and Lothstein's evaluations unpersuasive. In addition, as the arbitrators noted, the parties had agreed to the choice of Griffith as an independent evaluator. Thus, the plaintiff had not been wholly deprived of any opportunity to participate in and agree to the choice of an independent evaluator, who ultimately found Marchesseault fit for duty. This part of the remedy is viewed most plausibly, therefore, not as something that impinged on any substantial right of the plaintiff, but as something that was designed to remedy the plaintiff's unjustified denial of Marchesseault's request for the opportunity to present an evaluation by a medical expert of his own choosing, and to assuage any current, lingering doubts that the plaintiff

maintained, despite the factual findings by the arbitrators, regarding Marchesseault's fitness for duty.

In addition, the plaintiff's reliance on § 7-276 suffers from the same defect here as the Appellate Court's reliance on it. That section refers to the powers of local boards of police commissioners. The plaintiff does not have such a board. The plaintiff nonetheless seeks to draw from that statute a broader public policy—that "some public body—a police commission *or town government*—be responsible for the selection, direction and *dismissal* of police officers." (Emphasis added.) Assuming without deciding that this amounts to a specific, well-defined and dominant public policy, rather than one based on general notions of the public interest, we nevertheless reject the plaintiff's contention. The fact that the statute, as a matter of statutory policy, commits the selection, direction and dismissal of police officers to the town—an unremarkable policy statement to be sure—is not inconsistent with the concomitant notion that the grievance procedure set forth in a collective bargaining agreement covering the discipline of police officers, including discharge, is simply an additional step in that process. *Board of Police Commissioners* v. *Maher*, supra, 171 Conn. 621; *Board of Police Commissioners* v. *White*, supra, 171 Conn. 564.

Furthermore, the plaintiff fails to cite any independent source of public policy for its contention that *it* must be *certain* of Marchesseault's fitness for duty, irrespective of the arbitrators' findings. That factual determination was committed to the arbitrators, pursuant to the collective bargaining agreement and the unrestricted submission. There is no explicit, well-defined and dominant public policy that requires a town's view of an officer's fitness for duty to trump the arbitrators' contrary determination that has been arrived at pursuant to such an agreement and submission.

The third public policy advanced by the plaintiff is that the arbitration award violated the public policy requiring the confidence of the public in its police force with respect to matters of public safety because the plaintiff's action reasonably was based on the opinions of Zeman and Lothstein. This general consideration fails to meet the test that "the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 46. Furthermore, we see nothing that would impair informed public confidence in the plaintiff's police department, by virtue of a full and fair adjudication by a panel of arbitrators, based on the independent medical expert opinion of Griffith, in a conclusion that Marchesseault is in fact fit for duty.

The fourth alternate public policy advanced by the plaintiff is based on the fact that the arbitrators imposed on the plaintiff a higher burden of proof than the preponderance of the evidence, with respect to Marchesseault's termination for lack of fitness for duty, without giving the plaintiff advance notice of that higher burden.[18] The plaintiff contends that because due process of law requires that " 'the standard of proof necessarily must be calibrated in advance' "; *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 269, 471 A.2d 1380 (1984),

---

[18] It is undisputed that, with respect to Marchesseault's alleged lack of fitness for duty to support his discharge, as opposed to the question of his violation of the police department's duty manual, the arbitrators imposed a higher burden of persuasion than a preponderance of the evidence. It also is undisputed that the arbitrators first specifically articulated this burden in their award.

quoting *Santosky* v. *Kramer*, 455 U.S. 745, 757, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); the award violated that due process principle and, accordingly, the procedural public policy of fair notice that it embodies. We are not persuaded. First, because the submission was unrestricted, it did not preclude the arbitrators from adopting a burden of proof more demanding than the preponderance of the evidence. *New Haven* v. *AFSCME, Council 15, Local 530*, 9 Conn. App. 396, 400, 519 A.2d 93 (1986), cert. denied, 202 Conn. 806, 520 A.2d 1287 (1987).

Second, unlike civil litigation in our courts, in which a party has a legitimate expectation that the normal burden of persuasion of a preponderance of the evidence will be applied, unless the law has imposed a different standard; see *State* v. *James*, 237 Conn. 390, 418, 678 A.2d 1338 (1996); parties to a labor arbitration proceeding considering the question of whether a termination was for just cause have no such legitimate expectation. In such cases, the practice is much more flexible and, if anything, connotes the likelihood of a more demanding burden. As the authors of a recognized treatise on arbitration have noted: "Discharge is recognized to be the extreme industrial penalty since the employee's job, seniority and other contractual benefits, and reputation are at stake. Because of the seriousness of this penalty, the burden generally is held to be on the employer to prove guilt of wrongdoing, and probably always so where the agreement requires 'just cause' for discharge. . . . However, the quantum of required proof in this area is unsettled. In some cases proof beyond a reasonable doubt has been required. But in other cases a lesser degree of proof has been required, such as a preponderance of the evidence, or 'clear and convincing' evidence, or evidence 'sufficient to convince a reasonable mind of guilt.' " F. Elkouri & E. Elkouri, How Arbitration Works (5th Ed. 1997, E. Gog-

gin & M. Volz eds.) pp. 905–906. Indeed, as the Appellate Court also has noted, "arbitral application of a 'clear and convincing' standard is not unique in labor relations." *New Haven* v. *AFSCME, Council 15, Local 530*, supra, 9 Conn. App. 399.

In the present case, in light of both *Maher* and *White*, and the practice noted in the literature in this field, the plaintiff should have been aware of the potential of a burden of persuasion more demanding than a preponderance of the evidence. As the arbitrators noted, the consequences to Marchesseault of a termination for lack of fitness for duty carried grave consequences, not only for his job, seniority and other contractual benefits, but for his reputation for psychological stability.

Finally, the plaintiff points to no specific prejudice flowing from the imposition of the higher standard. The plaintiff does not claim, for example, that it would have presented its case to the arbitrators any differently had it known in advance of the burden of persuasion adopted by the arbitrators. This lack of prejudice has been cited by this court as undermining a similar claim of lack of notice in a civil proceeding involving termination of parental rights. See *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 270.

The plaintiff's final claim is presented as an alternate ground on which to affirm the judgment of the Appellate Court. This claim is that the Appellate Court improperly concluded that the arbitrators had not deprived the plaintiff of a fair hearing by excluding evidence regarding Marchesseault's efforts to obtain a favorable fitness for duty report.

We agree with the Appellate Court's disposition of this claim. The Appellate Court noted the arbitrators' broad discretion in evidentiary rulings in cases involving unrestricted submissions, the fact that they are not confined to the rules of evidence, and the principle that

"a party challenging an arbitration award on the ground that the arbitrator refused to receive material evidence must prove that, by virtue of an evidentiary ruling, he was in fact deprived of a full and fair hearing . . . [and] must prove that as a result of the improper ruling, [the party] suffered substantial prejudice." (Citation omitted; internal quotation marks omitted.) *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 57 Conn. App. 505–506. The Appellate Court then stated, and we agree: "The arbitrators' award demonstrates that the [plaintiff] was not prejudiced by the arbitrators' decision not to compel [Marchesseault] to answer the [plaintiff's] question concerning efforts he had made to obtain a favorable fitness for duty opinion prior to November, 1993. During the course of the hearing, the arbitrators were concerned that they, as laypersons, were faced with opposing expert opinions from the [plaintiff] and the [defendant] concerning [Marchesseault's] fitness for duty. The arbitrators, therefore, initiated a discussion between the parties that a neutral expert review [Marchesseault's] records and the expert opinions submitted to them. Griffith was the person the parties agreed should review the conflicting materials. Because the [plaintiff] agreed to submit the conflicting evidence to Griffith, whose opinion broke the deadlock and formed the basis of the arbitrators' award, we cannot say that the [plaintiff] did not receive a full and fair hearing because the evidence in question was excluded." Id., 506–507.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and to remand the case to that court with direction to grant the defendant's motion to confirm the award.

In this opinion the other justices concurred.