[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE APPLICATION TO VACATE ARBITRATION AWARD CT Page 14164
On June 5, 2000, the applicant, the City of Hartford (City), filed an application pursuant to General Statutes § 52-418[1] to vacate an arbitration award in favor of the respondent, Robert Casati, a police officer with the Hartford police department. The arbitration ensued as a result of Casati's reassignment as Deputy Chief by the Hartford Chief of Police after an investigation concerning a complaint of discriminatory conduct. The issues before the arbitrator, Albert G. Murphy, were "[w]hether Robert Casati is guilty of the charge of conduct unbecoming an Officer in violation of Article 1, Section 1:00 of the Hartford Police Code of Conduct," and, "[i]f so, what shall the remedy be?" The arbitrator found in favor of Casati, reinstating him to his position as Deputy Chief and ordering him to be made "whole for all losses of pay, benefits and seniority." The City maintains that the arbitrator's award should be vacated on the grounds that the award violates public policy and that the arbitrator exceeded his authority in issuing an award that went beyond the scope of the submission. On June 20, 2000, Casati filed a response seeking to confirm the award.
 I
The City first argues that the award should be vacated because it contravenes the public policy against workplace discrimination, and as such the trial court's review of the arbitration award challenged on public policy grounds is necessarily de novo. Casati argues that the evidence precludes a finding that he violated Article I § 1.00 of the Hartford Police Code of Conduct. Casati further argues that it is not the court's function to try this matter de novo or substitute its findings of fact for those of the arbitrator.
Our Supreme Court has held that "the judicial review of whether an arbitral award implicates and violates public policy is necessarily de novo review. . . . Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. . . . [W]here a party challenges a consensual arbitral award on the ground that it violates public policy; and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." (Citation omitted; internal quotation marks omitted.) State v. AFSCME, Council 4,Local 387, AFL-CIO, 252 Conn. 467, 475-76, 747 A.2d 480 (2000) (arbitration award reinstating state employee violated public policy CT Page 14165 because employee violated criminal statute and employment regulations set forth by its employer). Our Supreme Court has chosen to include "in our category of arbitral awards subject to de novo review those that potentially undermine a legitimate public policy objective." Schoonmakerv. Cummings Lockwood of Connecticut P.C., 252 Conn. 416, 434,747 A.2d 1017 (2000).
A two step analysis is employed in deciding whether an arbitral award violates public policy. "First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) State v. AFSCME, Council 4,Local 387, AFL-CIO, supra, 252 Conn. 476. "When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award." (Internal quotation marks omitted.) South Windsor v. Police Union Local 1480, Council 15,255 Conn. 800, 815, 770 A.2d 14 (2001). "A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation marks omitted.) Id.
 A
The court first determines whether a clear public policy is implicated in this case. The identification of a public policy requires a determination of "whether, as gleaned from a statute, administrative decision or case law, there exists a public policy mandate with which an arbitral award must conform." Schoonmaker v. Cummings Lockwood ofConnecticut, P.C., supra, 252 Conn. 428.
The City argues that the public policy that must be considered in the present case is the prohibition against workplace discrimination based on race, ethnicity, national origin and gender. That this case implicates this clear public policy cannot be disputed.
Both state and federal laws prohibit discrimination in the workplace on the basis of race, national origin, ethnicity and gender. See42 U.S.C. § 2000e et seq.; General Statutes § 46a-60 (a)(1). Title VII of the Civil Rights Act of 1964, 42 U.S.C; § 2000e et seq., "sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and CT Page 14166 psychological stability of minority group workers, and . . . [the federal statutory scheme] was aimed at the eradication of such noxious practices." (internal quotation marks omitted.) Firefighters Institute forRacial Equality v. St. Louis, 549 F.2d 506, 515 (8th Cir. 1977), cert. denied., 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977).
The Connecticut Fair Employment Practices Act, General Statutes §46a-51 et seq., likewise prohibits discrimination in the workplace. General Statutes § 46a-60 (a)(1), as amended by Public Acts 2001, No. 01-28, § 8, provides in relevant part that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer, by the employer or the employer's agent . . . to discriminate against [any] individual . . . in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness. . . ." The statute further provides that it is a discriminatory practice "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so. . . ." General Statutes § 46a-60 (a)(5).
Both federal and state case law have interpreted the above cited federal and state legislation to preclude the creation and maintenance of a hostile work environment, which is created when "the workplace [is] . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (Internal quotation marks omitted.) Brittell v. Dept. of Correction, 247 Conn. 148,166-67, 717 A.2d 1254 (1998); see also Oncale v. Sundowner OffshoreServices, Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201
(1998); Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87,88 (8th Cir. 1977) (derogatory ethnic comments and slurs by supervisor "could be so excessive and opprobrious as to constitute an unlawful employment practice under Title VII"). The law is clear that "once an employer has knowledge of a racially [or sexually] combative atmosphere in the work-place, he [or she] has a duty to take reasonable steps to eliminate it." (Internal quotation marks omitted.) Brittell v. Dept. ofCorrection, supra, 247 Conn. 168; see also Firefighters Institute forRacial Equality v. St. Louis, supra, 549 F.2d 515 (city, aware of racially discriminatory eating arrangements at firehouses, directed by court to promulgate regulations providing such arrangements may not continue).
In addition, "[i]t is beyond question that obedience to judicial orders CT Page 14167 is an important public policy." W.R. Grace Co. v. Local 759,461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). A federal consent order prohibits the use of offensive language by officers of the Hartford police department. In Cintron v. Vaughn, United States District Court, Docket No. 13, 578 (D.Conn. June 21, 1973), which involved allegations of discriminatory conduct on the part of the Hartford police department, the plaintiffs alleged that the defendants demonstrated an improper pattern of conduct directed at the plaintiffs and members of their class solely on account of their race or ancestry. The parties in that case agreed to a consent judgment. The parties agreed, inter alia, that the Hartford police department would adopt a racial epithet bulletin containing two provisions. The first provision provides: "Officers shall be courteous, civil, and respectful to their superiors, associates, and other persons, whether on or off duty. They shall be quiet, orderly, and attentive and shall exercise patience and discretion in the performance of their duties. They shall maintain an even temper, in spite of provocation, remaining cool and collected at all times. When requested to do so they shall give their name and badge number in a respectful, gentlemanly manner." The second provision provides: "Officers shall refrain from harsh, violent, coarse, profane, sarcastic, or insolent language. It is recognized that words with a derogatory connotation may have been used on certain occasions in friendly conversations without any intention of being discourteous or without any thought being given to the adverse effect these words might have on others who might hear the conversation. To avoid creating unpleasant situations, or when speaking to a group, [officers] shall avoid the use of derogatory terms or those terms which might be interpreted as derogatory, such as boy, hey boy, spic, wop, kike, chink, burrhead, dago, nigger, polack, bohunk, limey, frog, or kraut."
Finally, the Hartford police department has adopted a Code of Conduct that is reflective of the public police mandate identified by the above mentioned federal and state statutes and federal order.[2] The preamble to the Code of Conduct provides that "the following sections prescribe or prohibit specific conduct on the part of employees of the Hartford Police Department and violations of any of them will constitute cause for disciplinary action, . . ." According to the Code of Conduct, the use of racially or sexually discriminatory language within the department is a violation. Article I § 1.00 of the code provides that "any violation of the rules and regulations, published orders, directives, memoranda, or any lawful order, or any act which tends to undermine the good order, efficiency and discipline of the department, or which reflects discredit upon the Department or any member thereon shall constitute conduct unbecoming an officer. This section shall not be used when the employee's conduct is more specifically addressed by another section of the code." Article IV, Supervisory Responsibilities, § 4.01 of the code provides CT Page 14168 that "using rude, insulting or offensive language, or other offensive behavior by a supervisory officer towards an employee of lower rank," is conduct unbecoming an officer.
Thus, this court finds that state and federal statutes, case law, the federal Cintron order and the Hartford police department's Code of Conduct clearly evidence a well-defined and dominant public policy against workplace discrimination on the basis of race, ethnicity, national origin and gender. This court further finds that this public policy is implicated by the present case by virtue of the fact that it involves a supervising police officer charged with engaging in the use of offensive language, including racially, ethnically and sexually discriminatory remarks, while performing his duties at police headquarters.
 B
This court must now determine whether the arbitrator's award in this case conforms with the public policy just identified. The arbitrator summarized in his decision that "[t]estimony from City witnesses described [Casati] as irascible, grouchy, moody and explosive and given to profane, obscene gutter talk aimed at minorities, including women and homosexuals. His talk was described as being peppered with expressions such as `nigger,' `raisin head,' `dyke,' `fag,' `greaseball' and various other expressions referring to Italians, `third worlders,' `fudge packers,' `bimbos' and `drunk fucking micks." (Arbitration Award, p. 5.) The arbitrator found, however, that there was "no testimony or other evidence that [Casati] had ever directed such language directly at any individual nor in the presence of any such person. " (Arbitration Award, p. 5.) The arbitrator then summarized Casati's testimony: "He denied using profanity, obscenity, or racially charged language at or about anyone specifically, but acknowledged that he frequently used vulgar or otherwise socially questionable language." (Emphasis in original.) (Arbitration Award, p. 9.) Indeed, the arbitration hearing transcript reveals that Casati admitted to using the expression "third worlder," as well as "mick," "guinea," "guido," "greaseball," "raisin head," "bimbo" and "douche bag," although he denied that his use of these terms was intended to have racially, ethnically or sexually derogatory connotations. (Hearing Transcript, Exhibit B [Transcript], pp. 27-38.)
It is clear from the arbitrator's findings that the award in this case was based, not upon a finding that Casati did not engage in conduct prohibited by the Code of Conduct, but rather upon the arbitrator's attempts to rationalize and even excuse Casati's behavior. The arbitrator stated several reasons for doing so, including (1) the commonality, frequency and even expectation of such language in an environment such as CT Page 14169 police headquarters, (2) the "agenda" of witnesses against Casati because of the controversy surrounding him, (3) the lack of evidence that Casati ever made a discriminatory comment directly to a member of the department although it was "open to conjecture" whether he may have made such remarks about such persons and (4) the fact that no one had ever complained about Casati's conduct.
This court finds that the arbitrator's award condoning Casati's use of discriminatory language contravenes the clear and dominant public policy against workplace discrimination. It effectively undermines the City's efforts to comply with its legal duty pursuant to federal and state law, including the Cintron order, to take reasonable steps to eliminate racially, ethnically and sexually discriminatory language, which the arbitrator himself found was frequently and commonly used at police headquarters. That discriminatory terms and comments are not used in the presence of or directed at particular individuals has provided no defense to employers under employment discrimination laws. "Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment . . . the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." (Citations omitted.)Schwapp v. Avon, 118 F.3d 106, 111-12 (2nd Cir. 1997). Likewise, the fact that such terms and comments are "customary," frequent or more likely to be expected in certain workplace environments has also failed to insulate employers from liability. See, e.g., Robinson v. Jacksonville Shipyards,Inc., 760 F. Sup. 1486 (M.D.Fla. 1991) (shipyard workplace sexually hostile to women despite historical custom and small number of women in workplace); Brittell v. Dept. of Correction, supra, 247 Conn. 166-69 (employer of workers in prison required to address sexually hostile language and gestures).
Further, the Cintron order is a federal order that directs the officers of the Hartford police department to avoid the use of derogatory terms, regardless of whether an officer intends a particular term to have a derogatory connotation. Article I § 1.00 of the Code of Conduct clearly states that an officer's conduct is unbecoming if that officer acts in violation of any lawful order. Thus, to reinstate an officer, who by his own admission violated a federal consent decree, to a supervisory assignment is against public policy.
The Connecticut Supreme Court has held that an arbitrator's attempts to rationalize conduct that is clearly in violation of the law is grounds for vacatur. In State v. AFSCME, Council 4, Local 387, AFL-CIO, supra,252 Conn. 467, the court affirmed the trial court's decision vacating an arbitration award as violative of public policy. The award had reinstated a corrections officer whose employment was terminated after he placed an CT Page 14170 anonymous, obscene and racist telephone call to a state legislator from a workplace telephone while on duty. The trial court recognized the arbitrator's attempts to excuse the officer's conduct, in which the arbitrator found that the officer in fact engaged, as the product of personal stress. "Accordingly, the arbitrator justified reinstating [the officer] despite his conduct, which violated both statute and departmental regulations. [The Supreme Court agreed] with the trial court that, in doing so, the arbitrator minimize[d] society's overriding interest in preventing conduct such as that at issue in this case from occurring. Thus, the award — with its inherent rationalization of conduct stipulated to by [the officer], which was violative of statute and regulations — is in itself violative of clear public policy. As the trial court aptly stated, the termination of [the officer] as provided for in the department of correction regulations is warranted. . . . A lesser sanction . . . would, very simply, send the message that stress, or poor judgment, or other factors, somehow renders the conduct permissible or excusable." (Internal quotation marks omitted.) Id., 477. Thus, the court held that "the trial court properly concluded that an arbitration award violated a clearly defined public policy because the award reinstated a state employee whose conduct blatantly violated both a criminal statute and the employment regulations set forth by the department of correction. " Id., 478.
In the present case, the frequency and commonality of discriminatory comments; see Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994); is cause for remedial action, not excuse. It would be against public policy to enforce the arbitration award in this case.
 II
The City also claims a second ground for vacatur, namely, that the arbitrator exceeded his authority by issuing an award not conforming to the submission. The City argues that the arbitrator's decision avoids the issue of whether Casati violated the Code of Conduct by finding, not that Casati never engaged in the prohibited conduct, but rather that for various reasons his conduct could be rationalized or even excused. In addition, the City argues that the arbitrator had the authority under the submission to determine the appropriate discipline if and only if, the charges against Casati were proved and, therefore, did not have the authority if the charges were not proved to determine whether Casati should be reinstated as Deputy Chief, a position that the City contends is to be designated solely within the discretion of the Chief.
"Arbitration is a creature of contract between the parties and its autonomy requires a minimum of judicial intrusion. . . . The parties themselves, by the agreement of the submission, define the powers of the CT Page 14171 arbitrator. . . . The submission constitutes the charter of the entire arbitration proceedings and defines and limits the issues to be decided. . . . When the parties have agreed to a procedure and have delineated the authority of the arbitrator, they must be bound by those limits. . . . An application to vacate or correct an award should be granted when an arbitrator has exceeded his power." (internal quotation marks omitted.) Hartford v. International Assn. of Firefighters,Local 760, 49 Conn. App. 805, 811, 717 A.2d 258, cert. denied,247 Conn. 920, 722 A.2d 809 (1998). In determining whether an arbitrator has exceeded the scope of his or her authority, the court's inquiry is limited to a comparison of the submission and the award. State v. AFSCME, AFL-CIO, Council 4, Local 2663,257 Conn. 80, 85, 777 A.2d 169 (2001).
The court agrees with the City that the unequivocally worded submission authorized the arbitrator to consider remedies if, and only if, he found that the charges had been proven. The case of Hartford v. Local 760,6 Conn. App. 11, 502 A.2d 429 (1986), is instructive. In that case, the issue for arbitration was framed as follows: "Was the Grievant . . . suspended for just cause under the collective bargaining agreement? Ifnot, what shall the remedy be?" (Emphasis in original; internal quotation marks omitted.) Id., 12. The arbitrator answered the first question in the affirmative, deciding that the grievant was suspended for just cause, but went on to consider the remedy by reducing the length of the suspension. Id. The court held: "There is no question here that the award does not conform to the submission. The submission is clear on its face. By its language . . . the submission precluded the arbitrators from determining the question of remedy unless they found that the grievant was suspended without just cause. The phrase `if not,' in the context of the submission as a whole, does not mean `if so' which, under the circumstances of this case, would have required the arbitrators to respond to the second portion of the submission: `what shall the remedy be?'" Id., 14. Accordingly, the court concluded that the trial court did not err in finding that the arbitrators exceeded their authority as delineated within the submission. Id., 14-15.
The hearing transcript indicates that the parties specifically discussed whether Casati's reassignment, and the issues intendant to it, such as whether reassignments may only be for just cause, or whether they are at the sole discretion of the Chief, and whether Casati's reassignment in this case was justified under the circumstances, should be included in the submission. At the suggestion of counsel for Casati that the arbitrator determine these issues, counsel for the City clearly and unequivocally objected, stating: "The City objects . . . [to the reassignment issue] being included in any portion of the remedy. . . . The reassignment of Deputy Chief Casati to the position of Captain is not CT Page 14172 a part of these proceedings and it does not constitute discipline by the department." (Transcript, p. 9.) Later, counsel for the City reiterated its position: "And again, just restating the City's position, that we don't believe that it is within the authority of the arbitrator to . . . if you determine that the charges . . . are unfounded, to then restore him to a position to which lie is essentially not entitled to. It is, as I said an assignment by the chief that can be ended at any time." (Transcript, p. 13.) Moreover, counsel for Casati explicitly recognized that the parties did not agree to include the reassignment issue in the submission: "It's for this proceeding to result in the charges against Captain Casati being held to be unfounded and not yet-not allow him to be restored to the assignment of deputy chief would be profoundly unfair in my judgment, and that's really what I'm saying to you. There's adisagreement as to whether this should be included in the submission. "
(Emphasis added.) (Transcript, pp. 12-13.)
In the present case, the issues involved with Casati's reassignment clearly were not submitted to the arbitrator. The parties to an arbitration define and limit the powers of the arbitrator "by theagreement of the submission. " (Emphasis added.) Hartford v. InternationalAssn. of Firefighters, Local 760, supra, 49 Conn. App. 811. It cannot be said that the parties reached an agreement as to whether the reassignment issue should be submitted to the arbitrator, and, in fact, it was not. There is no evidence whatsoever that the parties agreed, orally or otherwise, to a modification of the written submission to expand its scope. Moreover, the issue of whether Casati violated the Code of Conduct cannot reasonably be interpreted to encompass the entirely distinct issues of the Chief of Police's discretion to assign and reassign positions and whether Casati's reassignment was justified under the circumstances. The distinctness of these issues is underscored by the fact that the only evidence, in the form of the police chief's testimony at the hearing, pertaining to the reasons why Casati was reassigned reveals that he was reassigned for reasons unrelated to violations of the Code of Conduct and would have been reassigned regardless of whether the Chief of Police accepted or rejected the truth of the charges against Casati. (Transcript, pp. 18-25.) Nevertheless, in its written award, the arbitrator concluded that the grant of authority to him by the parties was sufficiently broad to encompass both of these issues,
This court finds that the arbitrator exceeded his authority by deciding issues not submitted to him by the parties. See Housing Authority v.Local 1303-260, Council 4, AFSCME, 56 Conn. App. 786, 789-92, 746 A.2d 217
(2000) (holding that arbitration award properly vacated because issue decided by arbitrator not submitted to it by parties). Having found, for whatever reasons, the issues in favor of Casati, the arbitrator had no authority to remedy the perceived injustice of Casati's reassignment by CT Page 14173 reinstating him to the position of Deputy Chief with back pay, benefits and seniority.
 CONCLUSION
For the foregoing reasons, the court finds that the arbitration award in this case violates public policy and is in excess of the arbitrator's authority under the submission. Therefore, the City's application to vacate the arbitration award is granted, and Casati's application to confirm the award is denied.
Marshall K. Berger Superior Court Judge