# CITY OF HARTFORD *v.* LOCAL UNION NO. 760, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS

Superior Court, Judicial District of Hartford
File Nos. CV02-0818282S, CV01-0810463S

Memorandum filed March 12, 2003

*Corporation counsel of the city of Hartford*, for the plaintiff.

*Ferguson & Doyle*, for the defendant.

COHN, J. The two above-captioned matters arise as applications to vacate or modify arbitration awards. In both docket number CV02-0818282S and docket number CV01-0810463S, a grievance arbitration proceeding was held before a three member panel of the state board of mediation and arbitration between the city of Hartford (plaintiff or city) and Local Union No. 760, International Association of Firefighters (defendant or union). A majority of each panel issued an award favoring the defendant, and the plaintiff has applied to the Superior Court to vacate or modify the respective awards pursuant to General Statutes § 52-418. The union has applied to the Superior Court to confirm the awards.

The following facts were undisputed by the arbitration panels. The collective bargaining agreement (contract) in effect at the time of the grievance between the plaintiff city and the defendant union has, since July 1, 1978, contained a clause entitled "College Incentive

Pay."[1] In docket number CV02-0810463S, the grievant submitted copies of transcripts from Western States University (Western) to the fire chief and the personnel department and, on the basis of those transcripts, requested payment of a 5 percent college incentive payment as permitted under article 3, § 3.15, of the contract. The personnel department subsequently informed the grievant that the incentive payment was denied on the ground that Western was not accredited[2] in accordance with article 3, § 3.15, of the contract.

In docket number CV02-0818282S, each grievant submitted a diploma from Western as the basis for receiving college incentive pay. Both of the grievants were granted college incentive pay. This payment, however, was stopped upon discovery that Western is not an accredited university. At the hearing, the city stated for the record that for twenty years prior to 1998, credits were accepted from Western to fulfill the requirements of the college incentive program. A new collective bargaining agreement was reached in June, 2000, between

---

[1] The collective bargaining agreement provision at issue at the time of the grievances, and reviewed by the arbitrators, article 3, § 3.15, provided as follows:

"All current members of the bargaining unit who have successfully completed 60 credits but less than 120 credits from accredited colleges or universities shall receive 2.5 percent of the base rate of their salary range on a continuing basis. All bargaining unit members who have successfully completed 120 credits from accredited colleges or universities shall receive 5.0 percent of the base rate of their salary range on a continuing basis.

"Bargaining unit members who successfully complete sufficient credits to qualify for the college incentive pay shall submit official transcripts to the Office of the Fire Chief and the college incentive pay shall be effective the pay period immediately following the submission and approval of such transcripts. For purposes of this section, successfully completed means that an employee has received a passing grade for any credits taken."

[2] The arbitration panel found the definition of "accredit" or "accreditation" to mean "to certify [school or college] as meeting official requirements for academic excellence, curriculum, facilities, etc." Further, the panel defined "accredit" or "accreditation" as: "To certify as meeting certain set of standards [colleges may be accredited by regional associations]."

the city and the union providing that only colleges and universities accredited by regional accrediting associations would qualify for college incentive pay.

The union claimed that the grievants were entitled to an increase in pay based on the college incentive pay program since the continuous practice of the parties for over twenty years in interpreting article 3, § 3.15, of the contract was to provide college incentive pay for graduates of Western. The city based its denial on the contention that Western is not an accredited institution under the terms of § 3.15 of the contract because its accreditation was not by a "recognized" accreditation agency.

The records[3] in each grievance further show that the issue of accreditation began in 1998 when it was brought to the attention of Elizabeth Dunn, personnel administrator for the city of Hartford, that a firefighter received his bachelor's degree from Western and, two months later, received his master's degree from Western as well. Dunn was confused by the transcripts, since the graduate worked full–time as a firefighter during the two months between his two degrees. Dunn decided to investigate by conducting research into the accreditation process and Western.

According to Dunn's research, there are three levels to the accrediting process. The first level is the immediate accreditor, which, in the present case, is the Accrediting Commission International for Schools, Colleges and Theological Seminaries (commission). The second level is an institution that recognizes the accreditor as a bona fide accreditor. The final level is the agency, most often a governmental agency, i.e., the United States Department of Education (department), that approves

---

[3] The court assumes that the records regarding the accrediting institution and Western are interchangeable for each grievance. The union did not make any argument based on differences in the records between the grievances.

the recognizer. Dunn discovered that Western is neither accredited by any of the six regional accrediting agencies, nor by any agency recognized by the department.

Western claimed to be accredited by the commission. According to the department, the commission is not a nationally recognized accrediting agency. In other words, the United States Secretary of Education has not determined that the commission is a "reliable authority as to the quality of education or training provided by the institutions it accredits."[4]

The office of higher education for the state of Missouri also wrote to Dunn on November 6, 1998 stating that a prior accrediting group for Western called the International Association of Schools, Colleges and Theological Seminaries, had been enjoined by the Missouri attorney general in 1989 for selling accreditation. The commission had then taken over as accreditor but again, was "unrecognized" in Missouri.[5] The department of higher education for the state of Arkansas informed Dunn that the commission, located in Beebe, Arkansas, was not a recognized accreditor for those institutions located in Arkansas. The commission's Internet website states that the average cost of accreditation is $2000, including a necessary one time "on-site" visit. In response to a rhetorical question of whether "the benefits of membership justify the cost," the commission replies: "Yes. Absolutely! One of the first questions a prospective student asks a college or school is, 'Are [you] Accredited?' . . . . Schools use our name as a referral. . . . Hundreds of students are gained by our

---

[4] See letter with attachment dated October 30, 1998, from Karen W. Kershenstein, director of accreditation and eligibility, determination division of the United States Department of Education, to Elizabeth Dunn.

[5] The commission, located in Beebe, Arkansas, was merely a reformation of the early International Accrediting Commission according to J. Bean, College Degrees by Mail (1993).

membership each year based on the fact that the school is accredited."

Western does not require "students" to attend classes, complete course work or take examinations. Western awards degrees based on life experience and requires a payment based on the degree sought; i.e. $1900 for a bachelor's degree and $2400 for a master's degree.[6] In its student catalog, Western states: "We are not a teaching or instructional university at the present time."

Western's student catalog, which is part of the record in the present case, answers: "[h]ow it is done." The student assembles a portfolio of experiences, courses and learning activities. The student is urged to include everything, no matter how small, for the review of Western. The "registrar" at Western then "matches" this material to regular courses at traditional universities. A "pass" grade is then awarded to the student for each matching course.

The transcript in docket number CV02-0810463S indicates the grievant received a bachelor's degree in business administration from Western on September 2, 1998. It shows that the grievant was given twelve credits ("Grade: pass; attempted 12, earned 12.") for English courses, taken at Connecticut colleges, a list that he had placed in his portfolio. He also received like credit for other academic, real estate and business courses

---

[6] According to Western's student catalog, the minimum requirements for a bachelor's degree are as follows: "1. High school diploma or equivalent and over 21 years of age. 2. Resume, general (use [Western] form). 3. Student portfolio (transcripts, records, letters, dociments, supporting resume plus in depth data on academic, job and life experiences). 4. Letter or letters of recommendation from a degreed professional currently in specialization area selected by student for his/her own degree (can be waived if applicant's qualifications are exceptional). 5. Membership in a professional organization of student's selected degree area and 5 years work experience in desired field."

previously taken. For letters written about his various civic and union activities, the grievant received a "pass" and four credits for a course entitled "Creative Leadership."

Despite the fact that Western has no recognized accreditation, the city had been granting college incentive pay based on credits received through Western.[7] At the time of the grievances, fifteen firefighters were receiving college incentive pay based on Western credits.

In both cases the arbitration panels concluded that based on past practice and custom over the course of the past twenty years, the grievants were entitled to their college incentive pay. The majority found that the prior conduct of accepting credits from Western over the past twenty years created an obligation outside of § 3.15 of the contract to continue to accept credits from Western for college incentive pay. In essence, the past conduct of the city established an understanding that Western fit the requirements of accreditation under § 3.15 of the contract. The city argues that it was under the mistaken belief that Western was accredited, and changed its policy accordingly, when it was discovered that Western was not accredited.

Long–standing principles of arbitration law favor the union on the first issue raised by the city in its application to vacate. The city claims that § 52-418 was violated in that the arbitrators' award did not conform to its submission. In docket number CV02-0818282S, as previously indicated, the college incentive pay was halted after being initially allowed. The submission to the arbitration panel was as follows: "Did the City violate its

---

[7] The city did stipulate that for twenty years it had provided college incentive pay to persons having attended Western, but it maintains that this was under the belief that Western was an accredited institution as required by § 3.15 of the contract.

Collective Bargaining Agreement with Local 760 when it denied the grievants college incentive pay? If so, what shall the remedy be?" The award was as follows: "The grievances are sustained. Each grievant shall be made whole for all losses sustained as a result of the City's elimination of the college incentive payment."

The city's argument fails because " '[w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of [the court's] judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission.' " *Middlebury* v. *Teamsters Local Union No. 677*, 57 Conn. App. 223, 226, 748 A.2d 340 (2000), quoting *Garrity* v. *McCaskey*, 223 Conn. 1, 4, 612 A.2d 742 (1992). As to this docket, then, the city has failed to show that the submission was restricted; see *U.S. Fidelity & Guaranty Co.* v. *Hutchinson*, 244 Conn. 513, 516, 710 A.2d 1343 (1998); or that the award does not conform to the submission.

In docket number CV02-0810463S, in which the college incentive pay was never allowed, the question posed to the arbitration panel was as follows: "Did [the city] violate its Collective Bargaining Agreement (Article 3, Section 3.15) with Local 760 when it denied the grievant college incentive pay? If so, what shall the remedy be?" The award was as follows: "The [city] violated its Collective Bargaining agreement (Article 3, Section 3.15) with local 760 when it denied the grievant college incentive pay." This submission was also unrestricted. See *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 86, 777 A.2d 169 (2001).

The city argues that the arbitrators exceeded the submission in making use of the past practice of granting the college incentive pay to interpret the term

"accredited" in § 3.15 of the contract. A similar case that considered this issue is *Duxbury* v. *Duxbury Permanent Firefighters Assn., Local 2167*, 50 Mass. App. 461, 737 N.E.2d 1271 (2000). In *Duxbury*, the plaintiff denied that a firefighter could earn vacation or sick time while on injured on duty (IOD) leave. At a resulting arbitration, the arbitrator held that there was a "clear past practice of crediting similarly situated individuals on IOD leave with vacation and sick time." Id., 464. The appeals court "deferred" to this interpretation by the arbitrator, even though the plaintiff argued that there was no ambiguity in the contract. The parties had bargained for the arbitrator's interpretation, and they got what they bargained for. Id., 465.

The court, therefore, rejects the first contention raised by the city. *International Brotherhood of Police Officers* v. *Windsor*, 40 Conn. Sup. 145, 483 A.2d 626 (1984): "Normally, the court examines the award in light of the submission and if it finds conformity, the award stands. . . . If that were the sole standard, the award in this case should be confirmed." (Citation omitted.) Id., 147.

The second issue raised by the city—that the award violates public policy[8]—is more troubling. It was not fully considered by the arbitration panel in either grievance.[9] Our Supreme Court has held that "the judicial

[8] General Statutes § 52-418 (a) provides in relevant part that an award shall be vacated "if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." This has been construed to include cases in which the arbitrator's award contravenes public policy. See, e.g., *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 44, 757 A.2d 501 (2000).

[9] In docket number CV02-0810463S, there is no mention of the issue; in docket No. CV01-0818282S, the panel, in its memorandum of decision, stated: "Nor is this panel persuaded by the city's public policy argument. It is the view of a majority hereof that the issue of accreditation of [Western], or not, is not so clear cut as to constitute a basis either for the criminal actions alluded to by the city or the 'material misstatement of fact' necessary to serve as the basis of a claim of fraud."

review of whether an arbitral award implicates and violates public policy is necessarily de novo review. . . . 'Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. . . . [W]here a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy.' (Citation omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 475–76, 747 A.2d 480 (2000), quoting *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000). This law is based on the leading United States Supreme Court case of *W. R. Grace & Co.* v. *Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983): "If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it. . . . Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citation omitted; internal quotation marks omitted.) Id., 766.

Thus, the court must first determine whether such a public policy can be identified in the present application to vacate the award and then decide if the arbitrators' award violated this policy. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 476. In this analysis, "the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award." (Internal quotation marks

omitted.) *South Windsor* v. *South Windsor Police Union Local 1480, Council 15,* 255 Conn. 800, 815, 770 A.2d 14 (2001). "A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." Id.

According to the aforestated precedent, the court first addresses whether a public policy has been identified in the city's application to vacate the arbitration award. The applicable public policy must be "explicit," not merely drawn from considerations of "supposed public interest." *Groton* v. *United Steelworkers of America,* 254 Conn. 35, 46, 757 A.2d 501 (2000). In *South Windsor,* the Supreme Court ruled that an arbitration award should not have been vacated where a police officer had misused his weapon in an arrest and was restored to service by an arbitration panel. The town's valid public policy of requiring a police officer to be fit for duty had been satisfied under the facts as found by the arbitrators. In addition, the town's claimed goal of providing its citizenry with a competent police force was just a "general consideration" and could not be called a "public policy." *South Windsor* v. *South Windsor Police Union Local 1480, Council 15,* supra, 255 Conn. 824: see also *Ohio Council 8, AFSCME, AFL-CIO* v. *Trumbull Memorial Hospital,* 124 F. Sup. 2d 482, 486 (N.D. Ohio 2000) (public policy recognizing surgeon's judgment in supplying appropriate patient care was amorphous, not "explicit and specific").

On the other hand, in *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* supra 252 Conn. 476–77, our Supreme Court held that public policy required the vacation of an arbitration award reinstating a correction officer instead of terminating his employment for making a profane and racist telephone call to a state senator.

There was an " 'explicit, well-defined and dominant' ";
id., 472; public policy against anonymous racist tele-
phone calls made from a state owned telephone by a
state employee while on duty given that there was also
a state statute prohibiting harassing telephone calls.

The city claims that the award in the present case
violates the established public policy of disallowing
fraudulent or false claims from being presented by
employees to the city for payment. There is clearly a
public policy against public employees abusing their
position. See *Dept. of Auditor General* v. *Council 13,
AFSCME*, 136 Pa. Commw. 87, 90, 582 A.2d 98 (1990)
(office selling scheme by public employees), appeal
denied, 527 Pa. 654, 593 A.2d 425 (1991). There is a
further public policy of honesty by a public officer in
submitting official documents. *International Brother-
hood of Police Officers* v. *Windsor*, supra, 40 Conn. Sup.
148; see also *Stamford* v. *Stamford Police Assn.*, 14
Conn. App. 257, 260, 540 A.2d 400 (1988), approving of
public policy of honesty as identified in *International
Brotherhood of Police Officers.*

*Duxbury* v. *Duxbury Permanent Firefighters Assn.,
Local 2167*, supra, 50 Mass. App. 461, discusses town
employees filing for sick leave credit while on injury
leave and finds "a well-defined and dominant public
policy against 'windfall' payments to individuals, as a
result of erroneous actions by municipal officials in
making the payments in the first instances. . . . The
policy arises from a need to protect the public treasury
from unwarranted money payments."[10] (Citations omit-
ted). Id., 465.

---

[10] Although the *Duxbury* court recognized the public policy, it held that
the city had failed to show that there was any "windfall" under a proper
interpretation of a statute and the collective bargaining agreement. *Duxbury*
v. *Duxbury Permanent Firefighters Assn., Local 2167*, supra, 50 Mass. App.
465. In cases presently before this court, the majority of the arbitrators in
each panel did not find that Western was accredited, only that the city had
always accepted Western transcripts without objection.

Also closely related to submitting a less than honest report to a municipality is the situation in which a teacher seeks a position without possessing the proper academic credentials. See *Meehan* v. *Nassau Community College*, 243 App. Div. 2d 12, 676 N.Y.S.2d 178, (public policy of not permitting employees to teach history courses when not accredited in that subject matter), appeal denied, 92 N.Y.2d 814, 704 N.E.2d 228, 681 N.Y.S.2d 475 (1998).

The public policy of allowing a public employee to obtain only those benefits to which he or she is honestly entitled has been established by the state legislature in its enactment of General Statutes § 53a-119. Subsection six of § 53a-119 declares that "[a] person is guilty of defrauding a public community who . . . (C) as an officer . . . of any public community, with intent to prejudice it . . . presents . . . any fraudulent claim against such community. . . ." General Statutes § 53a-119 (6) (C). This statute, which was enacted almost in this same form in 1874, was from the first directed against employees who further fraudulent claims while "acting for the public weal; assisting the town in the discharge of its public duty." *State* v. *Clerkin*, 58 Conn. 98, 102, 19 A. 517 (1889).

A more recent opinion by our Appellate Court declares: "This state's compelling public policy of not tolerating the knowing misappropriation of state funds by state officials or employees cannot be disputed. General Statutes § 53a-119 (6), which explicitly proscribes such conduct, represents an unequivocal legislative articulation of this policy. The public policy of discouraging fraud generally is firmly rooted in our common law as well." *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 641, 608 A.2d 718 (1992). In *Kutas* v. *State*, 135 Misc. 2d 1044, 517 N.Y.S.2d 857 (1987), affd, 146 App. Div. 2d 542, 537 N.Y.S.2d 30, vacated as moot, 148 App. Div. 2d 306, 538 N.Y.S.2d 983 (1989), an employee

of the state motor vehicle department misstated his age to become eligible for employment, claiming to be fifty-seven when he was, in fact, seventy-one years of age. When he retired ten years later, his application for a pension was rejected. The court approved of this denial in part as follows: "Public employment is involved in this case and considerations of public policy would seem to add to the impropriety of paying benefits in the face of admitted fraud of the System." Id., 1050. In addition, numerous professionals have been disciplined for misrepresenting their academic credentials to prospective employers. See *In re Hadzi-Antich*, 497 A.2d 1062, 1064 (D.C. App. 1985), in which an attorney's wife erroneously prepared a list of his law school honors that was submitted to his employer.[11] Based on the foregoing, the court concludes that there is an explicit public policy against public employees submitting wholly unsubstantiated claims of educational achievement to their employer municipality to obtain a benefit or an advantage.

The court now "proceed[s] to the second prong of the analysis: whether the arbitrator[s'] award violated this clear public policy." *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477. The arbitrators in each grievance approved the granting of the college incentive pay allowed under the collective bargaining agreement. The records before the court show that the grievants received their degrees from an institution that was not "a teaching or instructional university," according to its own student handbook. It merely

---

[11] Statutory provisions also establish that Connecticut has adopted a public policy against schools of higher education that offer to confer "degrees" without appropriate state approval or accreditation. See General Statutes § 10a-34; *State* v. *DeWitt School, Inc.*, 151 Conn. 631, 634, 201 A.2d 472 (1964) (public policy to "protect the public from misrepresentations"). This public policy would extend to prohibit the graduates of unaccredited schools taking advantage of provisions in a collective bargaining agreement designed for those receiving college credit from an accredited institution.

took the grievants' list of life's experiences and created a transcript for each "student." In addition, Western has never been accredited by a recognized accreditor, only by one institution that was closed by the Missouri attorney general and another unrecognized either in Missouri or Arkansas.

The "resume review" degree program of Western may be contrasted with Connecticut's Charter Oak College (Charter Oak), established by the state board for academic awards under General Statutes § 10a-143. Charter Oak allows for "portfolio assessment." Information published by Charter Oak shows that the school accepts experiences that show prior learning, even if not in an academic setting, but the school will not award credits for experience alone or for internships or field schools. After consulting an academic counselor, the student constructs a narrative of experiences to support a claim of knowledge in a subject matter. The portfolio is "independently reviewed by two higher education faculty who are experts in the area they are reviewing. Faculty reviewers give written comments on the strengths and weaknesses of [a student's] portfolio." Specifically in contrast with Western, "[r]eviewers may award credits requested, deny credits, or ask . . . for clarification. This provides for a collaborative process, with opportunity for faculty to request further information in cases where they suspect that [the students] have knowledge but . . . have not described it sufficiently. In the event that faculty disagree in their assessments, [the] portfolio will be submitted to a third faculty evaluator whose decision is final."

Moreover, the court is not merely engaging in a quibble over the meaning of the word "accredited." For example, in *Goddard* v. *South Bay Union High School District*, 79 Cal. App. 3d 98, 101, 144 Cal. Rptr. 701 (1978), a history teacher was denied an "advancement on the salary schedule" because the school district

refused to accept courses he had taken at Southwestern University School of Law, a school not accredited by the standard regional accreditor. The law school was, however, approved by both the American Bar Association and the California State Committee of Bar Examiners. Id., 108. The court concluded that while the school district could properly restrict salary credits, the teacher had met the requirement of receiving credits from an "accredited" institution as properly defined. Id., 110. The school district had been too narrow in its interpretation of the term "accredited." Here, by contrast, the grievants tendered their transcripts from a school that taught nothing, that did nothing but assemble a transcript[12] and that has no accreditation whatsoever. To allow such awards to stand would offend public policy by rewarding employees for nonexistent educational achievements.

The union argues that the grievants were neither arrested nor censured for their conduct. In reviewing whether to vacate an arbitration award on public policy grounds, however, the court does not scrutinize the conduct of the individual, but the lawfulness of enforcing the award. *Groton* v. *United Steelworkers of America,* supra, 254 Conn. 35 (plea of nolo contendere to embezzlement). The union further argues that the grievants were unaware, because of the city's past attitude, that what they were doing could constitute the submission of a fraudulent transcript. The grievants' actions were, however, sufficiently volitional enough to raise a public policy ground to offset the usual deference given to an arbitration award. *State* v. *Council 4, AFSCME,* supra, 27 Conn. App. 642.

---

[12] The city agreed at oral argument that it would recognize those courses listed by Western on its transcript that had been previously taken at an accredited institution. Indeed, one of the grievants in these matters was able to obtain college incentive pay by resubmitting transcripts in this manner.

For the foregoing reasons, the court finds that the arbitration awards in both dockets violate public policy. The plaintiff's application to vacate each award therefore, is granted, and the defendant's application to confirm the award in each case is denied.[13]

---

[13] Because of this conclusion, the court does not rule on the plaintiff's ground to modify the award under General Statutes § 52-419.